AVALONBAY COMMUNITIES, INC. *v.* INLAND
WETLANDS COMMISSION OF THE
TOWN OF WILTON
(SC 16807)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued April 17—officially released October 14, 2003

*Timothy S. Hollister*, with whom were *Matthew Ranelli* and, on the brief, *Beth Bryan Critton*, for the appellant (plaintiff).

*Maureen Danehy Cox*, with whom, on the brief, was *Jennifer E. Sills*, for the appellee (defendant).

*Richard F. Webb*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (intervening defendant commissioner of environmental protection).

*Christopher J. Smith* and *William H. Ethier* filed a brief for the Home Builders Association of Connecticut, Inc., as amicus curiae.

*Opinion*

VERTEFEUILLE, J. The dispositive issue in this appeal is whether the trial court properly concluded that the defendant, the inland wetlands commission of the town of Wilton (commission), correctly exercised its jurisdiction by denying an inland wetlands permit to the plaintiff, AvalonBay Communities, Inc., despite the fact that the plaintiff's proposed construction of an affordable housing development did not include any activity within the wetlands, watercourses, or upland review area of its construction site. The plaintiff appeals from the judgment of the trial court dismissing its appeal of the denial of its application for an inland wetlands permit in conjunction with that proposed affordable housing development. The plaintiff claims that the trial court improperly concluded that the commission properly had denied the application because the plaintiff's construction activity outside the wetlands and watercourses would have a negative impact on the spotted salamander, a wildlife species whose habitat is outside the wetlands and watercourses, but which

breeds in the wetlands for several weeks each spring. We agree with the plaintiff. Accordingly, we reverse the judgment of the trial court.

The following facts and procedural history are undisputed. The plaintiff, a publicly owned Maryland corporation with a place of business in Wilton, Connecticut, is in the business of developing and managing apartment communities across the United States. In 1999, the plaintiff contracted to purchase a 10.6 acre parcel of land on Route 7 near the center of Wilton (property). The property contains approximately 0.32 acres of inland wetlands comprising two areas. The first area of wetlands is a 0.30 acre deciduous wooded wetland in the northwest portion of the property, which contains an intermittent watercourse flowing from west to east. The second area of wetlands is a 0.02 acre deciduous wooded wetland in the northeast portion of the property that extends off-site onto an adjacent property.

In May, 1999, the plaintiff initially applied to the commission for an inland wetlands permit in conjunction with its plans to construct on the property a 119 unit rental apartment complex, with 25 percent of the units set aside as affordable housing. The plaintiff proposed to conduct certain regulated activities on the property adjacent to the two areas of wetlands on the property. After holding a duly noticed public hearing, the commission denied the plaintiff's application, citing, among other things, the potential impact to the wetlands "buffer"[1] area, also called the "upland review" area.

---

[1] The term "buffer" area is synonymous with the term "upland review" area and, prior to 1996, the terms were often used interchangeably. In 1996, however, in an effort to clarify the Inland Wetland and Watercourses Act (act); General Statutes §§ 22a-36 through 22a-45; the relevant reference to a "buffer" area was deleted from General Statutes (Rev. to 1995) § 22a-42a (f). See Public Acts 1996, No. 96-157, § 3; see also 39 H.R. Proc., Pt. 14, 1996 Sess., p. 4722, remarks of Representative Jessie G. Stratton (stating that amendment "changes the language in the wetlands statute—but primarily seeks to clarify . . . what's been meant and what has been the practice").

In November, 1999, the plaintiff submitted a revised plan to the commission that eliminated all activities in the wetlands, watercourses and the upland review area. This proposal reduced the number of apartments by six, and abandoned the earlier plan to relocate a driveway. The plaintiff requested that the commission issue a declaratory ruling that the revised plan did not require the issuance of a permit because there were no wetlands regulated activities associated with the proposal. The commission denied the request, however, and instead, determined that the application proposed a "significant regulated activity," as defined by § 2.1.z3[2] of Wilton's inland wetlands and watercourses regulations. The commission further determined that a public hearing should be held on the plan pursuant to § 9.1 of the Wilton inland wetlands and watercourses regulations. At that hearing, which was held over the course of several evenings, the commission heard the testimony of numerous experts and received many reports.

After completion of the hearing, the commission voted to deny the revised application because the development of upland[3] areas of the property, which are outside the wetlands, watercourses and the upland review area, would result in destruction of the habitat of the spotted salamander, which, in turn, would result in "the loss or accelerated decline of the spotted salamander population . . . ." The commission concluded that, because the spotted salamander, a wetland obli-

---

[2] A "significant regulated activity" is defined by § 2.1.z3 of the Wilton inland wetlands and watercourses regulations, as "(c) [a]ny activity which substantially diminishes the natural capacity of an inland wetland, watercourse, or regulated area to provide flood control, to support desirable fisheries, wildlife, or other biological life . . . ."

[3] We use the term "upland" areas to describe nonwetland areas located beyond the upland review area adjacent to a wetland or watercourse, which have been identified by a local regulation as areas that the commission may regulate.

gate species,[4] breeds in wetland areas for several weeks in the spring, the "loss of this species from the site will reduce the biodiversity of the on-site wetland and the wetland and watercourse immediately adjacent to the [property]." In other words, the commission denied the permit because construction by the plaintiff occurring outside the wetlands and watercourses, and their buffer areas, would result in the loss or reduction of spotted salamanders, which make use of the wetlands for a brief period of time each year, with the result that the biodiversity of the wetlands would be reduced.

The plaintiff appealed[5] from the commission's denial of its application to the Superior Court pursuant to General Statutes § 22a-43 (a).[6] The trial court initially sustained the plaintiff's appeal. The commission and the commissioner of environmental protection (commissioner); see footnote 5 of this opinion; however, filed separate motions to reargue pursuant to Practice Book § 11-11,[7] which were granted by the court. After

[4] A "wetland obligate species" is one that depends on the wetlands for part of its life cycle.

[5] The commissioner of environmental protection was served with notice of the appeal and intervened as an additional defendant in the present appeal pursuant to General Statutes § 22a-43 (a). The claims in the commissioner's brief filed in this court do not depart significantly from the commission's claims, and therefore will not be addressed separately.

[6] General Statutes § 22a-43 (a) provides in relevant part: "The commissioner or any person aggrieved by any regulation, order, decision or action made pursuant to sections 22a-36 to 22a-45, inclusive, by the commissioner, a district or municipality or any person owning or occupying land which abuts any portion of land within, or is within a radius of ninety feet of, the wetland or watercourse involved in any regulation, order, decision or action made pursuant to said sections may, within the time specified in subsection (b) of section 8-8, from the publication of such regulation, order, decision or action, appeal to the superior court for the judicial district where the land affected is located, and if located in more than one judicial district to the court in any such judicial district. . . ."

[7] Practice Book § 11-11 provides: "Any motions which would, pursuant to Section 63-1, delay the commencement of the appeal period, and any motions which, pursuant to Section 63-1, would toll the appeal period and cause it to begin again, shall be filed simultaneously insofar as such filing is possible, and shall be considered by the judge who rendered the underlying

reargument, the trial court rendered judgment dismissing the plaintiff's appeal. The plaintiff then filed a petition for certification for review in accordance with General Statutes § 8-8 (o),[8] which was granted by the Appellate Court. We subsequently transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiff's first, and dispositive, claim is that the trial court improperly concluded that the commission's jurisdiction extends so far as to deny an inland wetlands permit because development activity occurring outside the wetlands[9] and upland review area could adversely affect the upland habitat of the spotted salamander, resulting in the reduction of the biodiversity in the on-site and off-site wetlands. The plaintiff argues that the act was intended to protect the wetlands from physical damage or intrusion, but was not intended to protect the wildlife that might rely on the wetlands for a portion of its life cycle.[10] The commission, relying on the legisla-

judgment or decision. The party filing any such motion shall set forth the judgment or decision which is the subject of the motion, the name of the judge who rendered it, the specific grounds upon which the party relies, and shall indicate on the bottom of the first page of the motion that such motion is a Section 11-11 motion. The foregoing applies to motions to reargue decisions that are final judgments for purposes of appeal, but shall not apply to motions under Sections 16-35, 16-36 and 11-12."

[8] General Statutes § 8-8 (o) provides: "There shall be no right to further review except to the Appellate Court by certification for review, on the vote of two judges of the Appellate Court so to certify and under such other rules as the judges of the Appellate Court establish. The procedure on appeal to the Appellate Court shall, except as otherwise provided herein, be in accordance with the procedures provided by rule or law for the appeal of judgments rendered by the Superior Court unless modified by rule of the judges of the Appellate Court."

[9] We use the term "wetlands" to include both wetland areas previously identified on the property.

[10] The plaintiff also claims that, in the event that this court determines that the commission did have jurisdiction to require an inland wetlands permit for the proposed activity, the trial court nevertheless improperly concluded that the record contains substantial evidence supporting the commission's denial of the permit. Because we conclude that the commission lacked jurisdiction, we do not address the second claim.

tive history of recent amendments to the act, disputes the plaintiff's interpretation of the act, and contends that the act should be construed liberally to include protection of the biodiversity of the wetlands.[11] We agree with the plaintiff.

The following additional facts are necessary to our resolution of this issue. The spotted salamander is a "wetland obligate species" that relies upon the wetlands for a portion of its life cycle.[12] For several weeks each spring, the spotted salamander inhabits an area of standing water within a wetland to breed. After these few weeks, the salamander returns to its habitat in the nonwetland, upland area for the remainder of the year. The spotted salamander is not a federal or state listed "threatened species,"[13] "endangered species"[14] or "spe-

[11] We note that although in his brief the commissioner took a similar position to the commission on the issue of the commission's regulatory jurisdiction, at oral argument before this court, the commissioner agreed with the conclusion that we reach herein with regard to the commission's jurisdiction.

[12] See footnote 4 of this opinion.

[13] General Statutes § 26-304 (8) provides in relevant part: " 'Threatened species' means any native species documented by biological research and inventory to be likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range within the state and to have no more than nine occurrences in the state, and any species determined to be a 'threatened species' pursuant to the federal Endangered Species Act . . . ."

Section 1532 (20) of title 16 of the United States Code defines "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."

[14] General Statutes § 26-304 (7) defines "endangered species" as "any native species documented by biological research and inventory to be in danger of extirpation throughout all or a significant portion of its range within the state and to have no more than five occurrences in the state, and any species determined to be an 'endangered species' pursuant to the federal Endangered Species Act . . . ."

Section 1532 (6) of title 16 of the United States Code defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary [of the Interior or the Secretary of Commerce]

cies of special concern,"[15] as those terms are defined by statute. See Regs., Conn. State Agencies §§ 26-306-1 (b) and 26-306-3 (3); see also footnotes 13, 14 and 15 of this opinion.[16] Rather, the spotted salamander is common to most Connecticut towns, including urban areas. The population of spotted salamanders in Connecticut generally is in decline because of continuing development, which has reduced the salamander's available habitat area.

In August, 1999, as part of its review of the plaintiff's initial application, the commission retained Michael Klemens, a herpetologist, who, after a three hour site tour, reported finding four spotted salamanders on the ten acre property. By contrast, the plaintiff's expert, Jennifer Beno, a biologist, was able to find only one salamander on-site near the second wetland area on the property, and two salamanders off-site near that same wetland. Two of the salamanders she found, however, were identified as redback salamanders, which do not use the wetlands to breed. Beno could not identify the type of the third salamander.

We first address the appropriate standard of review. Whether the trial court properly concluded that the commission had jurisdiction over the activities proposed by the plaintiff involves a legal question involving statutory interpretation, over which our review is ple-

to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man."

[15] General Statutes § 26-304 (9) defines "species of special concern" as "any native plant species or any native nonharvested wildlife species documented by scientific research and inventory to have a naturally restricted range or habitat in the state, to be at a low population level, to be in such high demand by man that its unregulated taking would be detrimental to the conservation of its populations or has been extirpated from the state . . . ."

[16] Sections 26-306-4 through 26-306-6 of the Regulations of Connecticut State Agencies catalog species that have been determined to be endangered, threatened, or of special concern. The spotted salamander is not, however, listed in any of the three categories of protected wildlife.

nary. See, e.g., *Waterbury* v. *Washington*, 260 Conn. 506, 546–47, 800 A.2d 1102 (2002).

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [231 Conn. 418, 431, 650 A.2d 557 (1994)]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Bender* v. *Bender*, [258 Conn. 733, 741, 785 A.2d 197 (2001)]. Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be

*the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003).

Prior to beginning our analysis, we briefly review the purpose and statutory scheme of the act as set forth in *Connecticut Fund for the Environment, Inc.* v. *Stamford*, 192 Conn. 247, 470 A.2d 1214 (1984). "The [act] is contained in General Statutes §§ [22a-28] through 22a-45, inclusive. Under the act the [commissioner] is charged with the responsibility of protecting inland wetlands and watercourses by . . . regulating activity which might have an adverse environmental impact on such natural resources. Under [General Statutes] §§ 22a-42 and 22a-42a, any municipality, acting through its legislative body, may authorize or create a board or commission[17] to regulate activities affecting the wetlands and watercourses located within its territorial limits and any such board or commission is authorized to grant, deny or limit any permit for a regulated activity. . . .

"The municipal inland wetland agency is authorized to establish the boundaries of inland wetlands and watercourse areas within its jurisdiction. Once such boundaries are established pursuant to procedures set forth in § 22a-42a, no regulated activity shall be conducted within such boundaries without a permit issued by the local agency.

"It is apparent from the foregoing that local inland wetland bodies are not little environmental protection

---

[17] Subsequent to the decision of this court in *Connecticut Fund for the Environment, Inc.* v. *Stamford,* supra, 192 Conn. 247, the act was amended to require, rather than encourage, municipal regulation of wetlands and watercourses. See Public Acts 1987, No. 87-533, § 5.

agencies. Their environmental authority is limited to the wetland and watercourse area that is subject to their jurisdiction. They have no authority to regulate any activity that is situated outside their jurisdictional limits. Although in considering an application for a permit to engage in any regulated activity a local inland wetland agency must, under § 22a-41, take into account the environmental impact of the proposed project, it is the impact on the regulated area that is pertinent, *not* the environmental impact in general." (Emphasis added.) Id., 249–50.

This court previously has concluded that a municipal inland wetlands commission may regulate activities taking place outside the wetlands boundaries and upland review areas if such activities are likely to have an impact or effect on the wetlands themselves. This rule was first articulated in *Aaron* v. *Conservation Commission*, 183 Conn. 532, 551–52, 441 A.2d 30 (1981), where the court upheld the regulation of septic tanks located within 150 feet of a watercourse because of the effect that the tanks might have on the watercourse. Several years later, this court relied on its decision in *Aaron* in deciding *Cioffoletti* v. *Planning & Zoning Commission*, 209 Conn. 544, 558, 552 A.2d 796 (1989), wherein the court upheld the regulation of upland mining activity because the activity would adversely affect the adjacent wetlands. Similarly, in *Mario* v. *Fairfield*, 217 Conn. 164, 172, 585 A.2d 87 (1991), this court upheld a regulation that required a permit to erect a structure on the nonwetland portion of property because of the potential effects to the wetlands.

Most recently, in *Queach Corp.* v. *Inland Wetlands Commission*, 258 Conn. 178, 779 A.2d 134 (2001), we addressed a challenge to the validity of several local wetlands regulations. The plaintiffs claimed that 1995 and 1996 amendments to the act, first codified at Gen-

eral Statutes (Rev. to 1997) § 22a-42a (f),[18] effectively overruled our previous case law and limited agency action to only those activities occurring in the wetlands. We concluded, however, that the plaintiff had misinterpreted § 22a-42a (f) (2), and that the section as amended merely codified our long-standing rule first set forth in *Aaron.* Id., 197.

We now turn to an examination of the provisions of the act insofar as they are pertinent to the issue before us. As we concluded in *Queach Corp.* v. *Inland Wetlands Commission,* supra, 250 Conn. 198, § 22a-42a (f) permits a commission, pursuant to its regulations, to regulate activities occurring outside of wetlands and watercourses provided those activities "are likely to impact or affect wetlands or watercourses." General Statutes § 22a-42a (f) (2). The commission in the present case has adopted this requirement in § 2.1z of its regulations, which provides that "[t]he Commission may rule that any other activity located within such upland review area or in any other non-wetland or non-watercourse area is likely to impact or affect wetlands or watercourses and is a regulated activity."

"Wetlands" and "watercourses" are defined terms under the act. General Statutes § 22a-38 (15) defines wetlands as "*land,* including submerged land . . . which consists of any of the *soil types* designated as poorly drained, very poorly drained, alluvial, and floodplain . . . ." (Emphasis added.) Watercourses are defined as "rivers, streams, brooks, waterways, lakes,

---

[18] Since those amendments; see Public Acts 1995, No. 95-313, § 5; Public Acts 1996, No. 96-157, § 4; General Statutes § 22a-42a (f) has remained unchanged and currently provides: "If a municipal inland wetlands agency regulates activities within areas around wetlands or watercourses, such regulation shall (1) be in accordance with the provisions of the inland wetlands regulations adopted by such agency related to application for, and approval of, activities to be conducted in wetlands or watercourses and (2) apply only to those activities which are likely to impact or affect wetlands or watercourses."

ponds, marshes, swamps, bogs, and all other *bodies of water*, natural or artificial, vernal or intermittent, public or private, which are contained within, flow through or border upon this state or any portion thereof . . . . Intermittent watercourses shall be delineated by a *defined permanent channel and bank* and the occurrence of two or more of the following characteristics: (A) Evidence of scour or deposits of recent alluvium or detritus, (B) the presence of standing or flowing water for a duration longer than a particular storm incident, and (C) the presence of hydrophytic vegetation . . . ." (Emphasis added.) General Statutes § 22a-38 (16).

We note that these pivotal definitions, which apply throughout the act, are narrowly drawn and limited to physical characteristics. Wetlands are defined as land consisting of various soil types; watercourses are limited to bodies of water; and intermittent watercourses must have a permanent channel and bank. Incorporating these definitions into § 22a-42a (f), it is apparent that the commission may regulate activities outside of wetlands, watercourses and upland review areas only if those activities are likely to affect the land which comprises a wetland, the body of water that comprises a watercourse or the channel and bank of an intermittent watercourse. The legislature did not adopt broad definitions of wetlands and watercourses that would protect aspects of the wetlands apart from their physical characteristics, such as, for example, the biodiversity of the wetlands or wildlife species that might be wetland dependent. We conclude, therefore, that the act protects the physical characteristics of wetlands and watercourses and not the wildlife, including wetland obligate species, or biodiversity.[19]

[19] There may be an extreme case where a loss of or negative impact on a wildlife species might have a negative consequential effect on the physical characteristics of a wetland or watercourse, but that is not the situation in the present case. Here, the commission claims only that the loss of the salamander will affect the biodiversity of the wetlands.

The legislature's failure to provide protection for wildlife or biodiversity in the important definitions of "wetlands" and "watercourses" in the act is significant because in other instances when the legislature has chosen to protect wildlife in analogous statutes, it has done so expressly. For example, the Coastal Management Act, General Statutes §§ 22a-90 through 22a-112, explicitly includes wildlife in its definition of "coastal resources." Section 22a-93 (7)[20] defines coastal resources in relevant part as "the coastal waters of the state, their natural resources, *related marine and wildlife habitat* . . . ." (Emphasis added.) "Absent such language by the legislature [in the present act], this court cannot engraft amendments into the statutory language." (Internal quotation marks omitted.) *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission*, 212 Conn. 727, 736, 563 A.2d 1347 (1989).

Our conclusion is further buttressed when we construe the definitional sections of the act together with other sections of the act. "In construing the act . . . this court makes every part operative and harmonious with every other part insofar as is possible . . . the statute must be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation." *Gillis* v. *White Oak Corp.*, 73 Conn. App. 523, 529, 808 A.2d 712 (2002). General Statutes § 22a-40 (b) (2)[21] of the act provides

[20] General Statutes § 22a-93 (7) provides in relevant part: " 'Coastal resources' means the coastal waters of the state, their natural resources, related marine and wildlife habitat and adjacent shorelands, both developed and undeveloped, that together form an integrated terrestrial and estuarine ecosystem . . . ."

[21] General Statutes § 22a-40 (b) provides in relevant part: "The following operations and uses shall be permitted, as nonregulated uses in wetlands and watercourses . . .

"(2) Outdoor recreation including play and sporting areas, golf courses, field trials, nature study, hiking, horseback riding, swimming, skin diving, camping, boating, water skiing, trapping, hunting, fishing and shellfishing where otherwise legally permitted and regulated."

that certain uses of the wetlands and watercourses are permitted as nonregulated uses, provided that they do not disturb the wetlands or watercourses. Among those permitted uses are "trapping, hunting, fishing, and shell-fishing where otherwise legally permitted and regulated." Certain department of environmental protection regulations explicitly allow for the intentional hunting and taking of spotted salamanders. See Regs., Conn. State Agencies §§ 26-66-13 (b)[22] and 26-55-3 (a).[23] Thus, the fact that the legislature did not provide municipal commissions with the authority to regulate the *intentional*, albeit limited, taking of wildlife, including spotted salamanders, within the wetlands and watercourses suggests that the legislature did not intend to authorize such commissions to deny a permit for incidental impacts to such wildlife that result from development exclusively in the unregulated, upland area of a site.

One final consideration also supports our interpretation of the act. Statutes must be construed, if possible, so that bizarre, difficult or impractical results do not occur. See, e.g., *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission*, supra, 212 Conn. 738. If we were to interpret the act as authorizing the denial of a permit due to development in the upland areas, the only consequence of which as it relates to the wetlands is the reduction in a wetland obligate species, the commission's jurisdiction would be limitless. Every attempt to develop a property with wetlands on-site or nearby off-site would require a review by the commission to

---

[22] Section 26-66-13 (b) of the Regulations of Connecticut State Agencies provides in relevant part: "The open season for taking adult Spotted Salamanders . . . shall be from May 1 through August 31. During the open season, adult Spotted Salamanders . . . shall only be taken by hand or hand-held implement. . . . The daily and season bag limit shall not exceed three (3) of each species. . . ."

[23] Section 26-55-3 (a) of the Regulations of Connecticut State Agencies provides in relevant part: "No person shall possess in excess of three (3) Spotted Salamanders . . . at any time."

determine whether the activity in the upland area might have a negative impact on a wetland obligate species. We rejected a similar claim that would have led to limitless jurisdiction in *Red Hill Coalition, Inc.*, stating that "[w]e will not presume that the legislature intended such a result." Id.

The commission nevertheless contends that the act is broad enough to include within its protection a wetland obligate species such as the spotted salamander. The commission relies on General Statutes § 22a-36,[24] which

[24] General Statutes § 22a-36 provides: "The inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed. The wetlands and watercourses are an interrelated web of nature essential to an adequate supply of surface and underground water; to hydrological stability and control of flooding and erosion; to the recharging and purification of groundwater; and to the existence of many forms of animal, aquatic and plant life. Many inland wetlands and watercourses have been destroyed or are in danger of destruction because of unregulated use by reason of the deposition, filling or removal of material, the diversion or obstruction of water flow, the erection of structures and other uses, all of which have despoiled, polluted and eliminated wetlands and watercourses. Such unregulated activity has had, and will continue to have, a significant, adverse impact on the environment and ecology of the state of Connecticut and has and will continue to imperil the quality of the environment thus adversely affecting the ecological, scenic, historic and recreational values and benefits of the state for its citizens now and forever more. The preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state. It is, therefore, the purpose of sections 22a-36 to 22a-45, inclusive, to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution; maintaining and improving water quality in accordance with the highest standards set by federal, state or local authority; preventing damage from erosion, turbidity or siltation; preventing loss of fish and other beneficial aquatic organisms, wildlife and vegetation and the destruction of the natural habitats thereof; deterring and inhibiting the danger of flood and pollution; protecting the quality of wetlands and watercourses for their conservation, economic, aesthetic, recreational and other public and private uses and values; and protecting the state's potable fresh water supplies from the dangers of drought, overdraft, pollution, misuse and mismanagement by providing an orderly process to balance the need for the economic growth of the state and the use of its land with

sets forth the policy underlying the act. We disagree with the commission. Although statutory language should be interpreted in light of the purpose and policy underlying its enactment; *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 26, 717 A.2d 77 (1998); the operative "language of the statute is the most important factor to be considered" when interpreting a statute. *State* v. *Courchesne,* supra, 262 Conn. 563.

Section 22a-36, which sets forth the purpose of the act, provides that, "[t]he inland wetlands and watercourses of the state . . . are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed." That section continues by providing that, "[i]t is, therefore, the purpose of sections 22a-36 to 22a-45, inclusive, to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution," which includes, among other things, "preventing loss of fish and other beneficial aquatic organisms, wildlife and vegetation . . . ." The provision in § 22a-36 that identifies as one of the broad purposes of the act, "preventing loss of fish and other beneficial aquatic organisms, wildlife and vegetation," must be evaluated, however, in the context of the act in its entirety. We conclude that, when viewed in the context of the act as a whole, this provision evinces an intent to protect wildlife as a secondary effect of protecting the wetlands and watercourses themselves. Several sections of the act support our conclusion.

the need to protect its environment and ecology in order to forever guarantee to the people of the state, the safety of such natural resources for their benefit and enjoyment and for the benefit and enjoyment of generations yet unborn."

First, an analysis of the act reveals that there are only two references to the protection of "wildlife" in the entire act. The first is in § 22a-36, the provision setting forth the general statement of the purpose of the act. The second is in § 22a-40 (b) (1),[25] which provides that conservation of wildlife is a nonregulated use of the wetlands and watercourses. In contrast, the important definitions of "wetlands" and "watercourses" in § 22a-38, which are core provisions of the act because of their incorporation into virtually all sections of the act, contain no reference to wildlife, nor to the "biodiversity" of wetlands and watercourses.

Second, the reference in § 22a-36 is to the prevention of the loss of *"beneficial* aquatic organisms, wildlife and vegetation . . . ." (Emphasis added.) "Beneficial" is defined as "[f]avorable; producing benefits. . . ." Black's Law Dictionary (7th Ed. 1997). "Beneficial" as used in the statute therefore denotes only that wildlife that enhances or has an advantageous effect on the wetlands and watercourses, thus emphasizing that it is the wetlands and watercourses themselves that are of primary importance in the act.[26]

The commission's reliance on General Statutes § 22a-41 (a) (4)[27] is likewise unavailing. Section 22a-41 (a)

---

[25] General Statutes § 22a-40 (b) provides in relevant part: "The following operations and uses shall be permitted, as nonregulated uses in wetlands and watercourses, provided they do not disturb the natural and indigenous character of the wetland or watercourse by removal or deposition of material, alteration or obstruction of water flow or pollution of the wetland or watercourse:

"(1) Conservation of soil, vegetation, water, fish, shellfish and wildlife . . . ."

[26] The record reveals no evidence, nor any claim, that spotted salamanders provide any benefit to the wetlands on the property or off-site.

[27] General Statutes § 22a-41 (a) provides in relevant part: "In carrying out the purposes and policies of sections 22a-36 to 22a-45a, inclusive, including matters relating to regulating, licensing and enforcing of the provisions thereof, the commissioner shall take into consideration all relevant facts and circumstances, including but not limited to . . .

"(4) Irreversible and irretrievable loss of wetland or watercourse

sets forth the criteria that must be considered by the commission in "carrying out the purposes and policies" of the act. Section 22a-41 (a) (4) requires the commission to consider "[i]rreversible and irretrievable loss of wetland or watercourse *resources* . . . ." (Emphasis added.) The commission contends, without citing any provision of the act or its legislative history, that "resources" logically includes "the living organisms that comprise the wetland ecosystems." We disagree. The term resources is not defined anywhere in the act. Moreover, we can find no support for such a broad interpretation of § 22a-41 (a) (4), especially in light of the narrow definition of wetlands and watercourses adopted by the legislature in § 22a-38 (15) and (16). We therefore reject the commission's proffered interpretation.

The commission further asserts that a close review of the legislative history of recent amendments to the act demonstrates a legislative concern with preserving wetlands functions, most specifically, their function in preserving biodiversity. We disagree. First, review of the pertinent legislative history reveals no substantive discussion concerning recent amendments to § 22a-38, the definition portion of the act and, therefore, that history sheds no light on the intent of the amendments. See Public Acts 1995, No. 95-313, § 1; Public Acts 1996, No. 96-157, § 1. Second, the specific, limited references to biodiversity in the legislative history that the commission cites simply are not reflected in the actual text of

resources which would be caused by the proposed regulated activity, including the extent to which such activity would foreclose a future ability to protect, enhance or restore such resources, and any mitigation measures which may be considered as a condition of issuing a permit for such activity including, but not limited to, measures to (A) prevent or minimize pollution or other environmental damage, (B) maintain or enhance existing environmental quality, or (C) in the following order of priority: Restore, enhance and create productive wetland or watercourse resources . . . ."

the amendments.[28] The text of the amendments contains no reference to the biodiversity of the wetlands. Most significantly, those amendments did not alter the definition of wetlands and watercourses in § 22a-38.

Having concluded that the trial court improperly determined that the commission acted within its statutory authority in denying the plaintiff an inland wetlands permit, we must address the scope of the remand after reversal of the trial court judgment. This court has held that, "[w]hen, on a zoning appeal, it appears that as a matter of law there was but a single conclusion which the zoning authority could reasonably reach, the court may direct the administrative agency to do or to refrain from doing what the conclusion legally requires." *Thorne* v. *Zoning Commission*, 178 Conn. 198, 206, 423 A.2d 861 (1979); see also *Chevron Oil Co.* v. *Zoning Board of Appeals*, 170 Conn. 146, 153, 365 A.2d 387 (1976).

It is undisputed in the present case that the plaintiff proposed no activities within the wetlands, watercourses or upland review area on the site of its proposed construction. The commission's only stated concern was the loss of the spotted salamander habitat in the upland area and its consequent effect on the biodiver-

[28] The commission points to the comments of Senator Catherine W. Cook on the floor of the Senate on two separate occasions as highlighting this point. Senator Cook stated: "The underlying purpose of any of these changes in the wetlands law, is to make certain that the function of the wetland is not interfered with by an applicant. If there is going to be an impact on a wetland of its function, and that goes certainly far beyond whether or not the ground will remain wet or not. But certainly goes to the filtration function. The *biodiversity function, and other issues that wetlands can perform in the ecological environment.* Those are being specifically clarified in the underlying bill." (Emphasis added.) 39 S. Proc., Pt. 9, 1996 Sess., pp. 2953–54.

Senator Cook further commented that "[t]hroughout the bill we discuss the idea of [the] function of the wetlands to make sure that we are dealing with more than just the geologic issue of hydro-geology and the water, but also talking about the *bio-diversity*, the filtration, and other functions that wetlands perform in the ecosystem." (Emphasis added.) Id., p. 2988.

sity of the wetlands. Because we have determined that the act does not confer jurisdiction over wildlife or the biodiversity of wetlands and watercourses, we conclude that the plaintiff's revised plan did not implicate any negative impact on the wetlands. The plaintiff's request to the commission for a declaratory ruling that the revised plan did not require the issuance of an inland wetlands permit therefore should have been granted.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment vacating the denial of the inland wetlands permit and remanding the matter to the commission with direction to issue a declaratory ruling that the plaintiff's revised plan does not require the issuance of such a permit.

In this opinion BORDEN, NORCOTT and PALMER, Js., concurred.

ZARELLA, J., concurring. I agree with the majority's conclusion in this case but write separately only to reaffirm my continuing belief in the plain meaning rule as expressed in my dissenting opinion in *State* v. *Courchesne*, 262 Conn. 537, 597, 618–19, 816 A.2d 562 (2003) (*Zarella, J.,* dissenting).