RIVER SOUND DEVELOPMENT, LLC *v.* INLAND
WETLANDS AND WATERCOURSES
COMMISSION OF THE TOWN OF
OLD SAYBROOK ET AL.
(AC 30042)

DiPentima, Robinson and Hennessy, Js.*

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 14—officially released July 27, 2010

*Brian R. Smith*, with whom were *Michele L. Maresca* and, on the brief, *Peter S. Olson*, for the appellant (plaintiff).

*Michael E. Cronin, Jr.*, for the appellee (named defendant).

*Matthew Ranelli*, for the appellee (defendant town of Essex).

*Charles J. Rothenberger*, with whom, on the brief, was *Roger Reynolds*, for the appellee (defendant Connecticut Fund for the Environment).

*David H. Wrinn*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Kimberly P. Massicotte* and *Matthew I. Levine*, assistant attorneys general, for the appellee

(defendant commissioner of environmental protection).

*Opinion*

DiPENTIMA, J. The plaintiff, River Sound Development, LLC, appeals from the judgment of the trial court dismissing its appeal from the denial by the defendant inland wetlands and watercourses commission of the town of Old Saybrook (commission)[1] of its application to conduct regulated activities pursuant to the Inland Wetlands and Watercourses Act (act), General Statutes § 22a-36 et seq. The plaintiff claims that (1) the commission improperly exercised jurisdiction over activities not occurring within a wetland or watercourse or within 100 feet of a wetland or watercourse and over impacts to species, (2) the record does not reveal substantial evidence to support the commission's finding that adverse impacts to the wetlands or watercourses will likely result from the proposed regulated activities and (3) the commission did not fulfill its statutory requirements because it engaged in a faulty feasible and prudent alternatives analysis. We affirm the judgment of the trial court.

The following facts and procedural history are undisputed. The plaintiff owns property, known as "the Preserve," consisting of approximately 934 acres that is located primarily in the town of Old Saybrook. Portions of the Preserve are also located in Essex (sixty-five acres) and Westbrook (two acres). In total, the Preserve contains 114.5 acres of wetlands. On August 11, 2005,

---

[1] In addition to the commission, the Connecticut Fund for the Environment, Inc., the commissioner of the department of environmental protection (department) and the town of Essex are defendants. The commissioner of the department was made a defendant in the trial court pursuant to General Statutes § 22a-43 (a). Each of the four defendants filed a brief with this court and participated in oral argument. They all essentially argue that the commission acted within its jurisdiction and that there is sufficient evidence to affirm the judgment.

the plaintiff filed an application with the commission, seeking to develop the Preserve with 221 residential housing units, a golf course, a roadway network, associated structures and infrastructure improvements.

On August 18, 2005, the commission accepted the application. On October 20, 2005, the Connecticut Fund for the Environment, Inc., intervened, and on December 8, 2005, the town of Essex intervened, both pursuant to General Statutes § 22a-19.[2] A public hearing took place over ten days beginning on October 20, 2005, and concluding on January 26, 2006. On March 18, 2006, the commission denied the plaintiff's application. The plaintiff appealed from the commission's decision to the Superior Court pursuant to General Statutes § 22a-43 (a). On February 19, 2008, by memorandum of decision, the court dismissed the plaintiff's appeal. The plaintiff now appeals to this court.

I

The plaintiff first claims that the commission improperly exercised jurisdiction over activities not occurring within a wetland or watercourse or within 100 feet of a wetland or watercourse and over impacts to species. More specifically, the plaintiff claims that the court should not have dismissed its appeal because, while its regulations provide the commission with jurisdiction to regulate activities occurring within a 100 foot upland review area, the commission's decision in this case was

[2] General Statutes § 22a-19 (a) provides: "In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

premised on evidence and testimony related to activities not occurring within a wetland or watercourse or within 100 feet of a wetland or watercourse, which is not consistent with the inland wetlands and watercourses regulations of the town of Old Saybrook (regulations). The plaintiff also claims that the commission's decision is improperly premised on the potential effect of the proposed activities on the life cycle of wood frogs. We do not agree.

First, we set forth our standard of review. "Whether the trial court properly concluded that the commission had jurisdiction over the activities proposed . . . involves a legal question involving statutory interpretation, over which our review is plenary." *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, 266 Conn. 150, 158–59, 832 A.2d 1 (2003).

In our application of the act, we take note of its purpose. "[W]e are mindful that the [act] rests upon a specific legislative finding that [t]he inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed, and that [t]he preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state. General Statutes § 22a-36. Accordingly, the broad legislative objectives underlying the [act] are in part to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution . . . [and by] protecting the state's potable fresh water supplies from the dangers of drought, overdraft, pollution, misuse and mismanagement by providing an orderly process to balance the need for the economic growth of the state

and the use of its land with the need to protect its environment and ecology in order to forever guarantee to the people of the state the safety of such natural resources for their benefit and enjoyment [and for the benefit and enjoyment] of generations yet unborn. General Statutes § 22a-36.

"In order to accomplish these objectives, it is the public policy of the state to require municipal regulation of activities affecting the wetlands and watercourses within the territorial limits of the various municipalities or districts. General Statutes § 22a-42 (a)." (Internal quotation marks omitted.) *Queach Corp.* v. *Inland Wetlands Commission,* 258 Conn. 178, 193–94, 779 A.2d 134 (2001).

A

The plaintiff first claims that the commission improperly considered proposed activity that was outside of the 100 foot upland review area in reaching its decision and that because the commission does not have proper jurisdiction to consider this evidence, the court should not have dismissed the plaintiff's appeal.

"Our courts consistently have recognized the authority of an inland wetlands commission to regulate activities in areas adjacent to wetlands and watercourses that would affect or impact such wetlands or watercourses." *Prestige Builders, LLC* v. *Inland Wetlands Commission,* 79 Conn. App. 710, 720, 831 A.2d 290 (2003), cert. denied, 269 Conn. 909, 852 A.2d 739 (2004); see also *Queach Corp.* v. *Inland Wetlands Commission,* supra, 258 Conn. 178; *Mario* v. *Fairfield,* 217 Conn. 164, 585 A.2d 87 (1991); *Lizotte* v. *Conservation Commission,* 216 Conn. 320, 579 A.2d 1044 (1990); *Aaron* v. *Conservation Commission,* 183 Conn. 532, 441 A.2d 30 (1981). "The authority to regulate in upland review areas . . . [is] viewed as discretionary in nature." *Prestige Builders, LLC* v. *Inland Wetlands Commission,* supra, 720.

The local inland wetlands commission, pursuant to that discretion, should enact regulations over upland review areas. See id.

General Statutes § 22a-42a (f) provides: "If a municipal inland wetlands agency regulates activities within areas around wetlands or watercourses, such regulation shall (1) be in accordance with the provisions of the inland wetlands regulations adopted by such agency related to application for, and approval of, activities to be conducted in wetlands or watercourses and (2) apply only to those activities which are likely to impact or affect wetlands or watercourses." The commission has adopted inland wetlands regulations for the town. Among these regulations is § 2.1, which defines "regulated activity." A portion of § 2.1 of the regulations mirrors the language of General Statutes § 22a-38 (13), which provides that " '[r]egulated' activity means any operation within or use of a wetland or watercourse involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or watercourses, but shall not include the specified activities in section 22a-40." Section 2.1 of the regulations additionally provides that "any clearing, grubbing, filling, grading, paving, excavating, constructing, depositing or removal of material and discharging of storm water on the land within 100 feet measured horizontally from the boundary of any wetland or watercourse is a regulated activity."[3]

In *Prestige Builders, LLC* v. *Inland Wetlands Commission*, supra, 79 Conn. App. 710, this court considered extensively the issue of a commission's jurisdiction

[3] In addition to the section defining regulated activity, the commission's regulations include a section entitled "Considerations for Decision." Section 10.2 (F) of the regulations provides that the commission may consider "[i]mpacts of the proposed regulated activity on wetlands or watercourses outside the area for which the activity is proposed and future activities associated with or reasonably related to, the proposed regulated activity which are made inevitable by the proposed regulated activity and which may have an impact on wetlands or watercourses."

to consider proposed activity outside the wetland or watercourse. In that case, this court stated that the act "requires only that a municipal commission regulate activity within or that makes use of inland wetlands or watercourses. The authority for a commission to regulate outside of those boundaries is governed by § 22a-42a (f) if the regulations are deemed 'necessary to protect [its] wetlands and watercourses. . . .' General Statutes § 22a-42 (c). What constitutes 'necessary' is interpreted 'as that which is reasonably designed to effectuate the stated purposes of the wetlands statutes.' . . . That legislative purpose is set forth in great detail in . . . § 22a-36. Our Supreme Court . . . described that purpose as being 'that [t]he inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed, and that [t]he preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state.' " (Citation omitted.) *Prestige Builders, LLC* v. *Inland Wetlands Commission,* supra, 718, quoting *Queach Corp.* v. *Inland Wetlands Commission,* supra, 258 Conn. 193. The court in *Prestige Builders, LLC,* concluded that "§ 22a-42a (f) grants a commission the authority to regulate upland review areas in its discretion if it finds such regulations necessary to protect wetlands or watercourses from activity that will likely affect those areas." *Prestige Builders, LLC* v. *Inland Wetlands Commission,* supra, 720. The validity of municipal regulations extending the jurisdiction of the local inland wetlands commission to upland review areas that reach beyond the physical boundaries of wetlands or watercourses consistently have been upheld by our Supreme Court. See *Lizotte* v. *Conservation Commission,* supra, 216 Conn. 337 (regulations

extending beyond scope of act valid if " 'reasonably designed to protect the town's wetlands and watercourses' "); *Aaron* v. *Conservation Commission*, supra, 183 Conn. 544 ("[w]here a municipal ordinance merely enlarges on the provisions of a statute by requiring more than a statute, there is no conflict unless the legislature has limited the requirements for all cases").

"[O]ur Supreme Court [has] noted that § 22a-42a (f) was not designed to overrule case law that provides that a regulated activity may include an activity that occurs in nonwetland areas, but that will affect or impact wetland areas. . . . Rather, the *Queach Corp.* court stated that § 22a-42a (f) effectively codified the statement made in the seminal case of *Aaron* v. *Conservation Commission*, supra, 183 Conn. 542, that [a]n examination of the [act] reveals that one of its major considerations is the environmental impact of proposed activity on wetlands and water courses, which may, in some instances, come from outside the physical boundaries of a wetland or water course." (Citation omitted; internal quotation marks omitted.) *Prestige Builders, LLC* v. *Inland Wetlands Commission*, supra, 79 Conn. App. 721.

Thus, an expansion of jurisdiction to include the 100 foot upland review area is valid under the act. "The municipal inland wetland agency is authorized to establish the boundaries of inland wetlands and watercourse areas within its jurisdiction. Once such boundaries are established pursuant to procedures set forth in § 22a-42a, no regulated activity shall be conducted within such boundaries without a permit issued by the local agency." *Connecticut Fund for the Environment, Inc.* v. *Stamford*, 192 Conn. 247, 250, 470 A.2d 1214 (1984). In fact, our Supreme Court has stated that "[e]stablishing an upland review of 100 feet . . . provides the commission with a trigger for reviewing whether activity is likely to affect the wetlands or watercourses." *Queach*

*Corp.* v. *Inland Wetlands Commission*, supra, 258 Conn. 201.

The commission found regulated activities within the 100 foot upland review area that impacted wetlands and watercourses. This is sufficient for the commission to have jurisdiction over the application and activities occurring within the upland review area. Upon a review of the record, we find substantial evidence supporting the commission's denial that falls within the jurisdictional reach of the commission. For example, REMA Ecological Services, LLC (REMA), prepared maps detailing where proposed regulated activities within wetlands and the upland review area would occur. The annotations on these maps describe potential impacts to the wetlands. While some of the annotations reference activities occurring outside the commission's upland review area, the majority of the annotations identify specifically regulated activities that are within the upland review area. Accordingly, we conclude that the court properly found that, in denying the application, the commission did not exceed its jurisdiction to consider the impact of activities and improvements proposed to be developed in wetlands and watercourses and in the 100 foot upland review area.

B

The plaintiff also claims that the commission improperly exercised jurisdiction over impacts to species. More specifically, the plaintiff claims that the commission stepped outside of its jurisdiction when it directly considered, in two of the eleven specific reasons for its denial, the life cycles of the spotted salamander, marbled salamander and wood frog in relation to the vernal pools, located within the area of certain of the proposed activities. We are not persuaded.

In *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission,* supra, 266 Conn. 163, our Supreme Court

stated that "it is apparent that the commission may regulate activities outside of wetlands, watercourses and upland review areas only if those activities are likely to affect the land which comprises a wetland, the body of water that comprises a watercourse or the channel and bank of an intermittent watercourse." See *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 68, 848 A.2d 395 (2004). Our Supreme Court concluded in *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, supra, 163, that "the act protects the physical characteristics of wetlands and watercourses and not the wildlife . . . ." The court, nevertheless, pointed out that "[t]here may be an extreme case where a loss of or negative impact on a wildlife species might have a negative consequential effect on the physical characteristics of a wetland or watercourse . . . ." Id., 163 n.19. Later, in 2004, the act was amended by Public Acts 2004, No. 04-209, to include subsection (c), now codified in General Statutes § 22a-41 (c), which provides that "[f]or purposes of this section, (1) 'wetlands or watercourses' includes aquatic, plant or animal life and habitats in wetlands or watercourses, and (2) 'habitats' means areas or environments in which an organism or biological population normally lives or occurs." Also included in the amended act was subsection (d), now codified in § 22a-41 (d), which provides that "[a] municipal inland wetlands agency shall not deny or condition an application for a regulated activity in an area outside wetlands or watercourses on the basis of an impact or effect on aquatic, plant, or animal life *unless such activity will likely impact or affect the physical characteristics of such wetlands or watercourses.*" (Emphasis added.) In the present case, substantial evidence was presented to show that the amphibian life contributed to the life cycle of the wetlands themselves.

The commission found that the development of the golf course would cause unacceptable fragmentation

and isolation of the area, which would result in a substantial reduction in the capacity of the wetlands to maintain animal life, especially amphibians, and that it greatly would reduce the capacity for survivorship of amphibians and that the clearing of forests adversely would affect amphibian populations and *nutrient and energy recycling* within the wetlands. The plaintiff's expert, Michael Klemens, testified that "[t]he wood frogs remove a lot of the detritus in the pools. The leaves' energy is transported through the wood tadpoles. They're one of the few species which you can say there's direct nexus biologically. And also, the actual quality of the water, physical parameters of the water, are affected by wood frog tadpoles, which is an important thing to take note of." Klemens also testified regarding the effect of wood frogs on the physical quality of water within the vernal pools and concluded that he "would actually call [wood frogs] a keystone species in terms of the wetlands cycles."

We conclude that there was substantial evidence in the record that the loss of wood frogs would have a negative consequential effect on the physical characteristics of the wetlands, which falls squarely within the commission's jurisdiction.

## II

Next, the plaintiff claims that the court improperly determined that the record contains substantial evidence to support the commission's finding that adverse impacts to the wetlands or watercourses likely will result from the proposed regulated activities. We do not agree.

"We begin with a review of the well established parameters of the substantial evidence test. It is widely accepted that, [i]n reviewing an inland wetlands agency decision made pursuant to [its regulations], the

reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Citation omitted; internal quotation marks omitted.) *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* supra, 269 Conn. 70; see also *Finley* v. *Inland Wetlands Commission,* 289 Conn. 12, 38, 959 A.2d 569 (2008). We further note that "[t]he party challenging the agency decision has the burden to show that substantial evidence does not exist in the record as a whole to support the agency's decision." (Internal quotation marks omitted.) *Fanotto* v. *Inland Wetlands Commission,* 108 Conn. App. 235, 239, 947 A.2d 422 (2008), appeal dismissed, 293 Conn. 745, 980 A.2d 296 (2009). The court's findings survive under the purview of the standard of review set forth by our Supreme Court in *River Bend Associates, Inc.,* and we therefore affirm those findings and conclude that the court properly upheld the commission's denial, as it is supported by substantial evidence.

At the commission hearing, the plaintiff and the defendants called several expert witnesses to testify

and presented exhibits as to the effect of the proposed activities on the wetlands and watercourses. In a written report contained in the commission's motion for denial of the application, the commission denied the application and found that "[b]ecause of the proposed layout and development of the project, and especially because the proposed 18-hole golf course is located in or in proximity to the dense wetland areas on the site, the [c]ommission finds that the proposed construction of the golf course in those designated wetlands areas is incompatible with the application of the principles and purposes of the Old Saybrook [i]nland [w]etlands regulations." The commission went on to list eleven specific reasons for the denial of the application. These reasons include (1) the adverse effect of "extensive blasting, grading, clearing and cutting on the steep slopes and shallow highly erosive and mobile soils in and around the outcroppings" on animal and plant life in and associated with the wetlands, (2) the inadequacy of the twenty-five foot buffer area around the wetlands, (3) the ineffectiveness of proposed silt fencing to prevent a significant amount of silt from flowing into wetland areas causing a major adverse impact, (4) the proposed construction activity likely will result in the flow of nitrates, silt and golf course chemicals and other pollutants into Pequot Swamp and likely will have a major and permanent impact on this wetland area, which is unique to this area of the state, (5) the proximity of the greens, fairways and tees to wetland areas likely will result in pesticides and herbicides leaching into adjacent wetland areas, and the proposed methods for controlling this leaching are unlikely to prevent it, (6) unacceptable fragmentation and isolation of the area, which would result in a substantial reduction of the capacity of the wetlands to maintain animal life, (7) possible adverse effects from the introduction of herbicides, pesticides and fungicides due to the leaching of these chemicals into the wetland areas, which

provide headwaters for the Oyster River, Trout Brook and Mud River, (8) concerns about the reduced capacity for survivorship of amphibians and the synergistic effects on them from golf course chemicals, (9) the concentrated injurious effect of the activities on Pequot Swamp because of the small watershed surrounding it, (10) the proximity of the leaching area for the septic system to Pequot Swamp and (11) the plaintiff had not met its burden of proof that the use of three wells to irrigate the golf course would not have an adverse effect on stream flow, inland wetlands and water levels in the wetlands and vernal pools because the test performed was not reliable.

The record reflects that there was sufficient evidence to support the commission's determinations that formed the basis for its denial of the plaintiff's application. The court noted in its memorandum of decision dismissing the appeal that there was "an abundance of expert testimony" to support the specific reasons for the denial of the application. Among the evidence cited by the court was the testimony of Peter Patton, a professor of earth and environmental science at Wesleyan University, George Logan, a certified professional wetlands scientist, and Sigrun Gadwa, an ecologist and registered soil scientist with REMA. Patton testified at the hearing and submitted a report that supported the findings set forth in the first specific reason for denial cited by the commission, regarding the siltation that would impact the wetland areas. In that report, he expressed concern about the "large-scale clearing and grading of steep slopes mantled with thin highly erodible soils on steep slopes adjacent to wetlands and watercourses across the entire area of the development." Additionally, Logan and Gadwa provided evidence regarding the adverse water quality and sedimentation impacts to the wetlands and watercourses on the site, particularly in areas where the

golf fairways and roads were in close proximity to the wetlands and watercourses. Upon reviewing this evidence, the court stated that "[a]lthough the [plaintiff] proposed to utilize sedimentation and erosion controls to mitigate the likely adverse impacts, several experts testified that, given the slope and soil characteristics of the site, the proposed measures were insufficient to avert the adverse impacts."

An environmental review report prepared for the commission's staff entitled "Environmental Review of Proposed Inland Wetland and Watercourse Activities: The Preserve," stated that the golf course design included 19.8 acres of tree clearing, regrading, fairway and green construction, and cart path construction that would create a disturbance within the 100 foot regulated upland review area. This report concluded that "[t]he magnitude of this disturbance will alter wetland ecology." Further, § 9 of that report details the specific wetland and upland review disturbances for each individual hole proposed for the golf course and potential concerns caused by those activities.

At the request of the Connecticut Fund for the Environment, scientists on behalf of REMA testified at the hearing and prepared a report that outlines many adverse impacts to the wetlands and watercourses located on the Preserve based on the proposed development plan, including (1) sedimentation, steep slopes and large areas, watershed impacts and narrow setbacks, (2) light and cutting impacts, (3) water quality impacts including road runoff, turf chemicals and nutrient loading, (4) biomass export and detritus processing and (5) wetland and vernal pool prioritization. REMA's report states, on the basis of its review of available reports and data, that "areas of particular concern [regarding physical, sedimentation impacts expected during construction] include the following: Hole 17, adjacent to Vernal Pool 3; the proposed roadway west

of Vernal Pool 19; Hole 8 to the southwest of Vernal Pool 23; Hole 16 west of Vernal Pool 7; and the west end of Hole 13, south of Wetland 19," and that in Wetlands 18 and 19, as well as Vernal Pools 19 and 22, "sedimentation and erosion *will occur* because there is insufficient distance for vegetation and leaf litter to filter the sediment that unavoidably passes through silt fence barriers, even if well-maintained, because these barriers are designed for through-flow, with a mesh opening larger than the size of a silt particle." (Emphasis added.) REMA introduced exhibits consisting of maps detailing where there are proposed regulated activities within wetlands and the upland review area. The annotations on these maps describe potential impacts to the wetlands. REMA concluded in its report that "[t]he Preserve plan as proposed is reasonably likely to [have the] effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the [s]tate. Moreover, an alternative development plan with a 9-hole golf course rather than an eighteen-hole golf course may be a feasible and prudent alternative to the proposal."

The commission provided citations to particular evidence within its written findings. For example, in deciding that the fragmentation and isolation of the area would result in a substantial reduction of the capacity of the wetlands to maintain animal life, the commission made a direct citation to § 4.0 of the report prepared for the staff, stating that "the concerns set forth in [the] report, and the failure of the applicant to adequately address said concerns in its applications, makes it unacceptable to grant a permit for this proposed activity." The commission went on to discuss, relying on the testimony of the plaintiff's experts, that certain types of species that live in the wetlands, including wood frogs and spotted salamanders, need upland wooded areas extending 750 feet from the edge of the vernal

pool. In this case, impacts to frogs result in impacts to wetlands. While the commission's jurisdiction extends only 100 feet from the wetlands, per its regulations, it is allowed to consider all proposed activity that would affect that area. See part I A of this opinion.

The plaintiff claims that there is expert testimony to support the opposite conclusion, which is that its proposed controls would be adequate to avert any adverse impacts. The court made comparison to the situation in *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 525 A.2d 940 (1987), in which our Supreme Court upheld the commission's denial of an application, holding that the commission could rely on the expert opinions that predicted an adverse impact on the wetlands, notwithstanding the presence of opposing expert opinions. Upon a review of the record, we determine that the court properly found that there was sufficient expert testimony regarding the substances that were likely to enter the wetlands, the inadequacy of the plaintiff's proposed mitigation measures and the adverse impacts to the wetlands as a result of the activity.

The court, after considering the evidence, found that "[t]he record reveals that the commission did evaluate the likely adverse impacts to wetlands from the golf course in light of the language of § 22a-40. It found that the construction and operation of the golf course would disturb the natural and indigenous character of the wetlands and result in the deposition of material into the wetlands and watercourses. . . . The commission thoroughly and painstakingly evaluated the evidence presented to it. On the basis of substantial evidence in the record, the commission properly determined that the activities proposed by [the plaintiff] would have an adverse impact on the wetlands and watercourses of the town of Old Saybrook." Upon a comprehensive review of the record, we determine that the various

testimony and exhibits presented at the hearing provided substantial evidence for the commission's denial of the application. Accordingly, we conclude that the court properly found that the commission's denial was supported by substantial evidence and dismissed the plaintiff's appeal.

III

Last, the plaintiff claims that the commission did not fulfill its statutory requirements because it engaged in a faulty feasible and prudent alternatives analysis. More specifically, the plaintiff claims that the commission failed to meet its burden to set forth specific feasible and prudent alternatives in its written denial. We do not agree.

The act forbids an inland wetlands agency from issuing a permit for a regulated activity unless it finds on the basis of the record that a "feasible and prudent alternative does not exist. . . ." General Statutes § 22a-41 (b) (1). In making the finding, the inland wetlands agency "shall consider the facts and circumstances set forth in subsection (a) of this section. . . ." General Statutes § 22a-41 (b) (1). Included among the factors for consideration set out in subsection (a) is the "applicant's purpose for, and any feasible and prudent alternatives to, the proposed regulated activity which alternatives would cause less or no environmental impact to the wetlands or watercourses . . . ." General Statutes § 22a-41 (a) (2).

The act defines "feasible" as that which is "able to be constructed or implemented consistent with sound engineering principles . . . ." General Statutes § 22a-38 (17). Prudent is defined as "economically and otherwise reasonable in light of the social benefits to be derived from the proposed regulated activity provided cost may be considered in deciding what is prudent and further provided a mere showing of expense will not

necessarily mean an alternative is imprudent." General Statutes § 22a-38 (18). "[A]n applicant for an inland wetlands permit has the burden of proving that it has met the statutory prerequisites for a permit. . . . The applicant, accordingly, must demonstrate to the local inland wetlands agency that its proposed development plan, insofar as it intrudes upon the wetlands, is the only alternative that is both feasible and prudent." (Citations omitted.) *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 593, 628 A.2d 1286 (1993).

"The act was designed to protect and preserve the indispensable and irreplaceable but fragile natural resource of inland wetlands by providing an orderly process to balance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology . . . . Instead of banning all economic activities on wetlands, the legislature realized that a balance had to be struck between economic activities and preservation of the wetlands." (Citation omitted; internal quotation marks omitted.) Id., 591. Nevertheless, an inland wetlands agency cannot grant a permit unless it finds that there are no feasible and prudent alternatives to the proposed regulated activity.

In its written decision, the commission stated that it considered "the applicant's purpose for, and any feasible and prudent alternatives to, the proposed regulated activity which alternatives would cause less or no environmental impact to wetlands or watercourses. Such alternatives should include, but [are] not necessarily limited to, requiring actions of [a] different nature which would provide similar benefits with [a] different location for the activity . . . ." The [c]ommission then found that "the applicant has not shown to the satisfaction of the commission that there are no prudent and feasible alternatives to the proposed activities." Finally, the commission found that it was unnecessary to make

a specific determination as to the proposed regulated activities for the construction of the roadway layout in the present application because the proposed roadway layout was based directly on the proposed golf course and residential development, which the commission had already denied.

The environmental review report stated that "[i]n our opinion, while the current application is much improved, it does not explore or discuss the feasibility of what would appear to be some basic alternatives, such as reducing the length of the golf course, or conversion of some of the proposed single family residential estate lots to clustered residential units. The latter alternative could have the potential to free up an area of sufficient size that would allow for the relocation of at least a portion of the golf course to non-regulated areas, thus retaining more natural buffers adjacent to the wetlands." The record contains references to alternative uses of the land that would have a lesser impact on the wetlands and watercourses, including eliminating or shortening the golf course. Therefore, we conclude that the court properly found that the commission had ample evidence to support its finding that the plaintiff had not sufficiently established the absence of prudent and feasible alternative uses for the property.

The judgment is affirmed.

In this opinion the other judges concurred.