******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

THREE LEVELS CORPORATION ET AL. *v.*
CONSERVATION COMMISSION OF
THE TOWN OF REDDING
(AC 34298)

DiPentima, C. J., and Gruendel and West, Js.

*Argued October 17, 2013—officially released February 11, 2014*

(Appeal from Superior Court, judicial district of

Danbury, Schofield, J.)

*Peter S. Olson*, for the appellant (defendant).

*Neil R. Marcus*, with whom was *Barbara M. Schellenberg*, for the appellees (plaintiffs).

*Opinion*

GRUENDEL, J. The defendant, the Conservation Commission of the Town of Redding (commission),[1] appeals from the judgment of the Superior Court sustaining the appeal of the plaintiff Three Levels Corporation[2] from its decision to deny the plaintiff's application for a license to conduct regulated activities pursuant to the Inland Wetlands and Watercourses Act (act), General Statutes § 22a-36 et seq. The commission's principal contention is that the court improperly sustained the appeal because substantial evidence in the record supports its findings that (1) the proposed activities presented a significant adverse environmental impact on the Saugatuck River and its associated wetlands system, and (2) the plaintiff's application was incomplete due to the plaintiff's failure to submit adequate information on the impact of the proposed activities on the river and wetlands. The commission further claims that the court improperly intimated that the commission lacked jurisdiction to regulate stormwater impacts on wetlands and watercourses due to a lack of regulations thereon. We affirm in part and reverse in part the judgment of the Superior Court.[3]

At all relevant times, Reeda B. Harsche owned a 14.19 acre parcel of land located in a residential zone and known as 626 Redding Road in Redding (property). The property contains 1.75 acres of inland wetlands.[4] Specifically, it features a vernal pool on the northeastern portion of the property and wetlands on the southeastern portion of the property. The property also is adjacent to floodplain wetlands and the Saugatuck River, which are located to the west of the property.[5] The Saugatuck River is a tributary to a major public drinking water supply and is a Class AA stream under the Connecticut water quality standards, as adopted by the Department of Energy and Environmental Protection (department).

The plaintiff is a prospective purchaser of the property and Harsche's authorized agent in the proceedings before the commission. In July, 2006, the plaintiff filed an application with the commission for a license to conduct certain regulated activities in connection with the proposed construction of a ten unit housing development on the property.[6] In its December 19, 2006 decision, the commission unanimously denied that application and the plaintiff appealed to the Superior Court, which dismissed the appeal. *Three Levels Corp.* v. *Conservation Commission*, Superior Court, judicial district of Danbury, Docket No. CV-07-4006860-S (April 24, 2008). In its memorandum of decision, the court noted that although the plaintiff's application listed only one "regulated activity [that] consisted of the placement of one subsurface waste disposal or septic system and related earth disturbing activities associated therewith within 500 feet of the high water line of a vernal pool

. . . [t]he project also involved the construction and operation of individual septic systems for each house and a community water supply system. The commission found that the application actually involved numerous other regulated activities, including 'the construction and operation of subsurface waste disposal systems, drainage systems and earth disturbing activities associated with the construction of ten proposed dwellings and driveways located upgradient and in close proximity to highly valuable wetlands and the Saugatuck River.' " In dismissing the appeal, the court found that (1) the plaintiff's application was incomplete due to the plaintiff's failure to submit "requested information regarding the effect on the wetlands and watercourses of activities conducted upgradient from [the specified] wetlands and watercourses" and "an updated vernal pool study," and (2) the plaintiff had failed to prove that a feasible and prudent alternative did not exist. Accordingly, the court sustained the decision of the commission.

On July 30, 2008, the plaintiff filed a second, and virtually identical, application with the commission. In the "anticipated regulated activities" portion thereof, the plaintiff once again stated: "The location of sealed pipes serving a subsurface waste disposal structure and related earth disturbing activities associated therewith within 500 . . . feet of the high water line of a vernal pool as regulated pursuant to Section 2.23c of the [Redding Inland Wetlands and Watercourses] Regulations." In the portion of the application asking applicants to "[d]escribe and diagram . . . potential alternatives to the proposed regulated activities," the plaintiff simply wrote, "N/A."

The commission held a public hearing on the application over the course of four evenings between November 18, 2008 and January 6, 2009. Following the culmination of its deliberations on February 17, 2009, the commission voted unanimously to deny the plaintiff's application. It thereafter published a written decision containing detailed findings. The commission found that the proposed regulated activities did not present a significant adverse environmental impact on the wetlands located on the northeastern and southeastern sides of the property. The commission then found that the proposed regulated activities and other site development "occur upgradient of and in the vicinity of the Saugatuck River, which is classified as a Class AA stream, and its associated wetlands system. . . . The Saugatuck River and the associated wetlands system, located on the western portion of the property and the adjacent property, are high value wetlands resources, and as such, the commission has reviewed the proposed regulated activities to determine if they are likely to have an impact on such resources . . . . Based on the foregoing, it is hereby moved that the Application for License to Conduct Regulated Activities

be and hereby is denied . . . ."

The commission proceeded to articulate four distinct grounds on which it was denying the application. First, the commission found "that the application proposes insufficient pretreatment facilities for stormwater prior to infiltration and ultimate discharge into the wetlands and Saugatuck River, and [the commission] therefore finds that the proposed regulated activities are likely to have a significant adverse environmental impact on the western wetlands and the Saugatuck River." Second, the commission found "that the soils on the site lend themselves to an extremely high rate of infiltration and groundwater mitigation, such that there will be insufficient time of travel to achieve adequate water quality renovation of stormwater and septic effluent prior to discharge into the western wetlands and Saugatuck River, and [the commission] therefore finds that the proposed regulated activities are likely to have a significant adverse environmental impact on the western wetlands and the Saugatuck River." As to each of those two grounds, the commission noted that it had heard expert testimony from four expert witnesses and that it found that of its consulting engineer, James MacBroom,[7] to be "most credible." The commission thus stated that it "chooses to rely on the expert testimony and conclusions presented" by MacBroom.

As a third ground, the commission found that "[d]espite repeated requests by the commission and Mr. MacBroom, the [plaintiff] has failed to present adequate information concerning the following subjects to allow the commission to conduct a sufficient review of the potential impacts of the proposed regulated activities: (a) The impact of the proposed regulated activities on the Saugatuck River; (b) The impact of pathogens from septic effluent on the wetlands and the Saugatuck River; and (c) The relationship between the 100 and 500 year flood lines of the Saugatuck River and the elevations of the proposed septic systems. . . . [T]he commission finds that the application presented to it is incomplete in these respects, and it can therefore not determine whether these issues might present a significant adverse environmental impact to the western wetlands or the Saugatuck River."

The fourth and final ground for the commission's denial of the plaintiff's application concerned potential alternatives to the proposed regulated activities. It stated: "The commission is unable to conclude that there are no feasible and prudent alternatives to the proposed regulated activities which would cause less or no environmental impact to the wetlands or Saugatuck River. The commission finds that there may be feasible and prudent alternatives to the proposed regulated activities, and the [plaintiff] should investigate one or more of the following alternatives to determine whether the property can be developed with less or no environ-

mental impact to the wetlands and the Saugatuck River: (a) Reduce the number of proposed structures and/or the size of the proposed septic system so as to provide room for additional pretreatment facilities for stormwater in key areas prior to discharge into the wetlands and the Saugatuck River and to increase the natural infiltration of stormwater thereby reducing the amount of stormwater which must be controlled and redirected; (b) Relocate or consolidate all or a portion of the proposed development, so as to provide room for additional pretreatment facilities for stormwater in key areas prior to discharge into the wetlands and the Saugatuck River; (c) Develop the property pursuant to the existing zoning code so as to use traditional single-family septic systems rather than community septic systems, thereby reducing the potential discharges into the wetlands and the Saugatuck River."

From that decision, the plaintiff timely appealed to the Superior Court. On September 22, 2011, the court issued its memorandum of decision sustaining the plaintiff's appeal. In so doing, the court reviewed and rejected each of the four distinct grounds articulated by the commission in its written decision. The court thus ordered that "[t]he matter is remanded to the commission for further consideration of any conditions that should be attached to the issuance of the permit to conduct the regulated activity." (Internal quotation marks omitted.)

The commission thereafter filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o). We granted the petition, and this appeal followed.

I

The commission's principal contention is that the court improperly sustained the plaintiff's appeal because substantial evidence in the record supports the commission's findings that (1) the proposed activities presented a significant adverse environmental impact on the Saugatuck River and its associated wetlands system, and (2) the plaintiff's application was incomplete due to the plaintiff's failure to submit adequate information on the impact of the proposed activities on the river and wetlands. The standard of review applicable to such claims is well established. "In challenging an administrative agency action, the plaintiff has the burden of proof. . . . The plaintiff must do more than simply show that another decision maker, such as the [Superior Court], might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. . . . In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the

reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Citations omitted; internal quotation marks omitted.) *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 587–88, 628 A.2d 1286 (1993).

As our Supreme Court has explained, the substantial evidence standard "is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention." (Internal quotation marks omitted.) *Lawrence* v. *Kozlowski*, 171 Conn. 705, 713, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977). The substantial evidence standard "has been described as a test that is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . *New England Cable Television Assn.*, *Inc.* v. *Dept. of Public Utility Control*, 247 Conn. 95, 118, 717 A.2d 1276 (1998). Plainly, then, substantial evidence and clearly erroneous are not synonymous standards. See *Dickinson* v. *Zurko*, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (clearly erroneous standard stricter than substantial evidence standard); *Case* v. *Morrisette*, 475 F.2d 1300, 1307 n.35 (D.C. Cir. 1973) (substantial evidence and clearly erroneous not synonymous); *W.R.B. Corp.* v. *Geer*, 313 F.2d 750, 753 (5th Cir. 1963) (same), cert. denied, 379 U.S. 841, 85 S. Ct. 78, 13 L. Ed. 2d 47 (1964). . . .

"The distinction between the clearly erroneous and substantial evidence standards is not an academic one. The clearly erroneous standard of review provides that [a] court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . *Considine* v. *Waterbury*, 279 Conn. 830, 858, 905 A.2d 70 (2006); see also *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948). The substantial evidence standard is even more deferential. Under the substantial evidence standard, a reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evi-

dence does not prevent an administrative agency's finding from being supported by substantial evidence . . . . *Tarullo* v. *Inland Wetlands & Watercourses Commission*, 263 Conn. 572, 584, 821 A.2d 734 (2003). Significantly, substantial evidence is something less than the weight of the evidence. *Rogers* v. *Board of Education*, 252 Conn. 753, 768, 749 A.2d 1173 (2000). The substantial evidence standard imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and [provides] a more restrictive standard of review than [the] clearly erroneous [standard of review]. . . . *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 331, 732 A.2d 144 (1999)." (Footnotes omitted; internal quotation marks omitted.) *Brunswick* v. *Statewide Grievance Committee*, 103 Conn. App. 601, 611–12, 931 A.2d 319, cert. denied, 284 Conn. 929, 934 A.2d 244 (2007). Because that standard "permits less judicial scrutiny" than the clearly erroneous standard of review; *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control*, supra, 247 Conn. 118; "[t]he term 'substantial evidence' appears to be something of a misnomer." *Brunswick* v. *Statewide Grievance Committee*, supra, 612 n.11. With that standard in mind, we turn to the commission's specific claims.

A

The commission maintains that the record contains substantial evidence, in the form of MacBroom's expert testimony, to support its finding that the proposed regulated activities are likely to have a significant adverse environmental impact on the western wetlands and the Saugatuck River. In response, the plaintiff argues that MacBroom's testimony failed to identify any specific adverse environmental impact that would result. On the record before us, we agree with the plaintiff.

"Determining what constitutes an adverse impact on a wetland is a technically complex issue"; *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 78, 848 A.2d 395 (2004); frequently necessitating resort to expert testimony. Although the commission in the present case heard from multiple experts, it expressly found "most credible" and chose to rely on the expert testimony of MacBroom, as was its exclusive prerogative.[8] "It is well established that credibility and factual determinations are solely within the province of the commission . . . and the commission is not required to believe any witness, even an expert . . . ." (Citation omitted; internal quotation marks omitted.) *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, 293 Conn. 93, 123, 977 A.2d 127 (2009). For that reason, in determining whether the commission's findings were supported by substantial evidence, the court was obligated to defer to the commission's assessment of the credibility of the expert witnesses. See *Gardiner* v.

*Conservation Commission*, 222 Conn. 98, 108, 608 A.2d 672 (1992).

MacBroom provided expert testimony during the December 16, 2008 public hearing on the sufficiency of the erosion and soil control measures proposed by the plaintiff's activities on the property. He stated in relevant part: "[One] area of discussion concerns very limited soil erosion control plans . . . . As you know, the proposed project is adjacent to a very high quality wetland system which is adjacent to the Saugatuck River which is a Class AA river and is [a] tributary to [a] major drinking water supply reservoir, and so it's really imperative that we do every (inaudible) effort we can to protect the reservoir, the river and the adjacent wetlands from the possibility of physical or chemical or biological contamination. In this particular case, the erosion control efforts to try to prevent no physical material, topsoil, sand, material from excavation, [and] material from future activities from getting into the wetlands and getting into the (inaudible) system and right now, at the downstream perimeter of the active construction zone, the plan only shows a single row of silt fence, which is a very minimal type of protection. It certainly, in my opinion, is not sufficient to avoid having *some type* of adverse impact on the wetlands due to sediment and erosion materials getting into the wetland, the pond and the rivering system." (Emphasis added.) He further testified that the likelihood of that adverse impact "is very strong." MacBroom described the plaintiff's erosion and soil control plan as "minimal" and emphasized that "there's no permanent sediment basins, no stormwater detention ponds, no grass swales and no way to easily maintain the inside infiltration perimeter of the infiltration units."

MacBroom also opined that the underground infiltration system proposed by the plaintiff has "a very high failure rate" since "there isn't any way to easily maintain [it]." He testified that "the stormwater infiltration units are too close to the proposed buildings," which "makes the basins very hard to maintain." He continued: "I don't think people would like to have their front yard dug up every few years if the basin needs to have maintenance. It's a system that basically is going to be unmaintainable without having great inconvenience to the neighborhood. The theory is that if something is hard to maintain and expensive to maintain, generally they tend not to be maintained. If it's not maintained, and this is a hypothetical, then you would have adverse impact on the wetland system both from excessive runoff and from the lack of removal of the impurities that tend to be taken out by the infiltration system."

In addition, MacBroom assessed the adequacy of the temporary sediment basins proposed by the plaintiff during the excavation of the proposed buildings. He stated: "Now, they're at the base of a top of a hill where

if you're familiar with drainage systems, water always goes downhill so you always have to put the sediment control systems at the bottom of the hill, not at the top of the hill. So, how and why these temporary sediment basins would be effective remains somewhat obscure simply because of their geospatial location to be diplomatic. . . . [F]ill material will not be draining into them. Most of the fill material is placed on the down gradient side of the virtual sediment basins . . . and so the sediment is not likely to reach the basins and is more than likely to discharge into the wetlands area."

In his January 28, 2009 letter to the commission,[9] MacBroom summarized his "outstanding concerns" regarding "the final revised application and plans" presently before the commission. He noted that "[o]ur previous review letters and public hearing testimony discussed a broad array of topics, of which the focal point has been the probable impact of the project upon adjacent designated inland wetlands and watercourses, including drinking water sources. Although the development activities are not within the wetland boundaries, the project's wastewater effluent, stormwater runoff, and sediment loads will move downgradient into the regulated area. The [plaintiff] has gradually added measures that only partially mitigate short-term impacts to the wetland. The stormwater drainage system is a particular concern because its design focuses upon peak flow rates and flood issues by storing and discharging parking lot water into the subsoil (connected to the aquifer), with minimal water quality protection. There are no surface water treatment measures (sediment basins, grass swales, buffer zones) to treat runoff prior to infiltration, just a small manhole sediment trap with low efficiency. There are no measures for biologicial treatment or nutrient removal. Therefore, these materials will go into the soil and probably the wetland.

"The proposed stormwater infiltration galleys are subsurface and cannot be effectively maintained without full removal. Since they are in a front yard only 12 feet from a building, periodic removal and replacement is unlikely. . . . The 2004 Connecticut Stormwater Quality Manual . . . considers underground infiltration to be a secondary practice 'due to limited field performance data.' Among the reasons listed for limited use are undocumented field longevity, potential failures, susceptibility to clogging by sediment, risk of ground water contamination, and unsuitability for stormwater runoff from land uses or activities with the potential for high sediment or pollution loads.

"The proposed wastewater disposal system consists of conventional septic tanks and subsurface leaching fields, on a large scale due to the project density. It has been determined that the system appears to meet the Public Health Code, but its environmental impact upon the designated wetlands is uncertain. . . . On larger

lots, the impact of chemicals is considered to be minor due to low concentrations. We do not know what the chemical impact of concentrating so many wastewater systems in a small area will be. On this proposed project, no definitive proof of its impact, or non-impact, has been provided." MacBroom's letter concluded that "the proposed project is likely to have a significant adverse impact upon the adjacent designated inland wetlands and the Saugatuck River." The commission, as sole arbiter of credibility, was free to credit and rely on that expert testimony.

The plaintiff nevertheless asserts that MacBroom's expert testimony failed to establish with sufficient certainty that adverse environmental impact. The plaintiff relies on *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 57, *Estate of Casimir Machowski* v. *Inland Wetlands Commission*, 137 Conn. App. 830, 49 A.3d 1080, cert. denied, 307 Conn. 921, 54 A.3d 182 (2012), and *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, 130 Conn. App. 69, 23 A.3d 37, cert. denied, 303 Conn. 908, 32 A.3d 961, 962 (2011), in support of its contention that MacBroom failed to precisely identify "the specific, adverse impact that he believed would result." A review of that authority, therefore, is necessary to properly evaluate the commission's claim in this appeal.

Like the present case, *River Bend Associates, Inc.*, involved an application to conduct regulated activities in connection with the construction of a housing development on property containing inland wetlands and watercourses. See *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 61–62. The defendant commission denied that application, finding, inter alia, "that the proposed development would sever the site from a much larger interconnected ecosystem in the region, thereby adversely affecting the on-site wetlands and wildlife; that it likely would cause excessive sedimentation in the wetlands and watercourses; and that it possibly could cause pesticide mobilization that could detrimentally affect the wetlands and watercourses." (Footnote omitted.) Id., 63–64. The Superior Court dismissed the plaintiffs' appeal, holding that there was substantial evidence to support the denial of the plaintiffs' application. Id., 65. On appeal to our Supreme Court, the plaintiffs claimed that the Superior Court improperly applied the substantial evidence test by failing to require that there be specific evidence in the record showing that the plaintiffs' activities would in fact adversely impact the wetlands or watercourses and by failing to require that the decision to deny the application be supported by more than a possibility of adverse impact. Id., 69–70.

Our Supreme Court agreed with the plaintiffs, holding that "[e]vidence of general environmental impacts,

mere speculation, or general concerns do not qualify as substantial evidence." Id., 71. The court noted that although the commission had "found that the plaintiffs' proposed plan to remediate soil contamination on the property through soil mixing 'may increase pesticide mobility and result in . . . greater pesticide transport . . . into wetlands and watercourses,' " it nevertheless remained that the commission "made no specific finding of any *actual* adverse impact to any wetlands or watercourses." (Emphasis altered.) Id., 76–77. The court similarly discounted the commission's reliance on the expert testimony of a project environmental engineer "that while the vast majority of elements would be removed by the storm water management system, 'over 36 [percent] of nitrogen, copper, and zinc would not be removed by the stormwater control devices and would flow into the wetlands and watercourses.' " Id., 80. The court explained that the expert's statement "does not meet the substantial evidence test because it does not provide a substantial basis in fact that *any specific harm to the wetlands or watercourses will occur* from the dispersal of these elements into a wetland or watercourse." (Emphasis added.) Id., 81. *River Bend Associates, Inc.*, thus instructs that the substantial evidence standard requires evidence of specific, actual harm to the environment, rather than general impact thereto.

In *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, supra, 130 Conn. App. 76, this court applied that precept to a denial of a permit due to, inter alia, inadequate erosion control measures that created "the significant likelihood of construction phase and post-development erosion and sedimentation of materials into both the regulated setback, the wetlands and Pumpkin Ground Brook." (Internal quotation marks omitted.) On appeal, the Superior Court determined that although the record substantiated the finding "that some sediment and siltation will enter the brook and its associated wetlands despite the use of the control measures proposed by the plaintiff," the defendant inland wetlands and watercourses agency "never moved beyond speculation in order to establish" an actual adverse effect thereof. (Internal quotation marks omitted.) Id., 77. This court agreed with that determination. In so doing, we rejected the defendant's claim that the mere entry "of any amount of sediment or siltation into a wetlands or watercourse automatically would be deemed to be an adverse impact." Id., 77 n.8. To the contrary, we held that the record contained "no evidence as to the amount of sediment and siltation that would enter or the harm to the wetlands or watercourse that would result from that amount, due to the plaintiff's activities at the site. Given the record before the defendant, we conclude that the concern regarding potential pollution from sediment and siltation does not rise above speculation. Accordingly, the record does

not contain substantial evidence because there is no specific finding of any actual adverse impact to any wetlands or watercourses. . . . The defendant could not simply assume that the entry of sediment and siltation would adversely affect the wetlands and watercourse without evidence that it would in fact do so." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 78.

At issue in *Estate of Casimir Machowski* v. *Inland Wetlands Commission*, supra, 137 Conn. App. 833, was the efficacy of a detention basin located "immediately upslope of a wetland area." In rejecting the plaintiff's appeal, the Superior Court concluded that "the proposed detention pond would be built on a steep slope and that 'any failure' of the basin would 'clearly impact' the wetlands on the property and further exacerbate already severe downstream flooding conditions." Id., 834. On appeal to this court, the plaintiff argued that "there is no specific evidence in the record that the fill needed for the project or the location of the detention basin in the upland review area would, in fact, adversely impact the downslope wetland. . . . [T]he court simply assumed that (1) the detention basin would likely fail and (2) that such failure would adversely affect the downslope wetlands, without any evidence in the record to support either assumption. . . . [T]he commission's expert referred only to a potential impact, but that there was no opinion that an adverse impact was likely should the detention basin fail, or, moreover, that a failure of the detention basin was reasonably likely to occur." (Emphasis omitted.) Id., 838.

This court agreed with the plaintiff, concluding that "the evidence . . . regarding both the prospect of a failure [of the detention basin] and the potential impact such a failure would have on the wetlands is speculative in nature." Id., 841. We stated that the case was "analogous to *River Bend Associates, Inc.*, in that there was no evidence before the commission that the activity proposed by the plaintiff would have an adverse effect on the wetlands. Our careful review of the record reveals that there was no evidence supporting a likelihood that the detention basin would fail because of its location or otherwise. There also was no evidence *specifically indicating what effect, if any, a failure of the detention basin would have on the downslope wetlands*. Evidence submitted by the commission's experts referred only to potential damage to wetlands and mentioned the possibility that the detention basins would fail. . . . Evidence regarding potential impacts to wetlands in the event of a failure of the detention basin does not in itself amount to substantial evidence." (Emphasis altered; footnotes omitted.) Id., 839–40.

On our review of the record before us, we agree with the plaintiff that MacBroom's expert testimony, although detailed, suffers a similar infirmity. Although

he articulated numerous concerns and critiques of the plaintiff's proposed activities, he did not identify any specific, actual harm that was likely to occur to the wetlands or the Saugatuck River. See *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 81. The substantial evidence test is not met by a general statement by an expert that "some type" of adverse impact is likely to result from the proposed regulated activities.[10] See id., 71; *Estate of Casimir Machowski* v. *Inland Wetlands Commission*, supra, 137 Conn. App. 839–40; *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, supra, 130 Conn. App. 78. Absent evidence that identifies and specifies the actual harm resulting therefrom, a commission cannot find that the proposed activities will, or are likely to, adversely impact wetlands or watercourses.

We note that the commission argues that the foregoing precedent improperly shifted the burden from the applicant to the commission in such proceedings. In its reply brief, the commission alleges specifically that, in *Estate of Casimir Machowski*, this court "improperly ignored established precedent which places the burden on the applicant to demonstrate that it is entitled to the permit it seeks."[11] At oral argument, counsel for the commission asked us to revisit that authority. We decline to do so. As an intermediate appellate tribunal, this court is not free to depart from or modify the precedent of our Supreme Court. See *Hartford Steam Boiler Inspection & Ins. Co.* v. *Underwriters at Lloyd's & Cos. Collective*, 121 Conn. App. 31, 48–49, 994 A.2d 262, cert. denied, 297 Conn. 918, 996 A.2d 277 (2010). Furthermore, "[a]s we often have stated, this court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc." (Internal quotation marks omitted.) *First Connecticut Capital, LLC* v. *Homes of Westport, LLC*, 112 Conn. App. 750, 759, 966 A.2d 239 (2009). We thus decline the commission's invitation to reconsider that precedent.

B

The commission also found, as an independent basis for denying the plaintiff's application, that the plaintiff's application was incomplete. In its decision, the commission stated in relevant part that "[d]espite repeated requests by the commission and Mr. MacBroom, the [plaintiff] has failed to present adequate information concerning the following subjects to allow the commission to conduct a sufficient review of the potential impacts of the proposed regulated activities: (a) The impact of the proposed regulated activities on the Saugatuck River; (b) The impact of pathogens from septic effluent on the wetlands and the Saugatuck River; and (c) The relationship between the 100 and 500 year flood

lines of the Saugatuck River and the elevations of the proposed septic systems. Accordingly, the commission finds that the application presented to it is incomplete in these respects, and it can therefore not determine whether these issues might present a significant adverse environmental impact to the western wetlands or the Saugatuck River."

A commission is entitled to deny an application before it due to incompleteness. See, e.g., *Ventres* v. *Inland Wetlands & Watercourses Commission*, 25 Conn. App. 572, 574, 595 A.2d 914 (inadequate plan for erosion and sediment control is valid reason for denying wetlands permit), cert. denied, 220 Conn. 921, 597 A.2d 344 (1991). The Redding Inland Wetlands and Watercourses Regulations (Rev. 1999) (regulations)[12] contain specific requirements regarding this issue. Section 5.7 of the Redding Inland Wetlands and Watercourses Regulations provides in relevant part that "[a]fter an initial review by the Commission and/or its consultant(s) of the submitted application, the applicant may be required to provide one or more items of information that are listed in the Appendix and/or other items of information necessary for the Commission to fulfill its obligations pursuant to the Act. . . ." Subsection (a) of that section similarly provides that "[a]t any time during the review of the application, the Commission may require the applicant to submit additional information about the proposed activities." Redding Inland Wetlands and Watercourses Regs., § 5.7 (a). The regulations expressly authorize the commission to deny an application due to incompleteness: "Any application deemed incomplete, due to the initial submittal or an applicant's failure to provide additional information as required pursuant to Section 5.7, may be denied by the Commission or withdrawal by the applicant." Id., § 5.8.

The record before us contains evidence substantiating the commission's determination that it lacked adequate information to determine the impact of the proposed activities on the western wetlands or the Saugatuck River. In his September 16, 2008 letter to the commission, MacBroom explained that, at the request of the commission, he had reviewed the plaintiff's revised application. He noted that he had "not found any new information on the impact of the wastewater disposal systems on downgradient inland wetlands and the pond nor the impact on the Saugatuck River, which is a tributary to a drinking water reservoir. Using the [plaintiff's] new estimate of the recharged ground water mound, the effluent travel time to the wetland should be recomputed and compared with standard assumption on bacteria life spans. . . . The [plaintiff's] comments or compliance with the Public Health Code and the Connecticut Department of Environmental Protection Guidelines seem to confuse human health protection versus environmental protection. We are concerned about water quality, wetland impacts, and

drainage impacts, not just minimum code requirements that lead to minimum performance. The USEPA On-site Wastewater Treatment Systems Manual (February 2002) is an excellent reference on performance-based design. For example, what is the new nitrogen load on the pond and will ammonia toxicity occur or eutrophication?" MacBroom concluded his review by stating that "the proposed development is likely to have an impact upon downgradient wetlands, but the magnitude of said impact has never been quantified. There has been a lot of speculation but little analysis."

Approximately two months later, MacBroom sent another letter to the commission regarding his review of "additional information pertaining to the proposed project" on the property. He noted that "[t]he initial plans have gone through several cycles of review, comment, and revisions, leading to the current proposal. The project is located in a public water supply shed and would have its own on-site water supply and waste-water disposal. Key inland wetland-related issues are the potential impact of wastewater disposal, soil erosion, and stormwater runoff upon the receiving wetlands and watercourses." MacBroom then made several comments on the revised proposal, stating in relevant part: "Surface water runoff pollutants, such as oil and gas drippings, salt and deicers, fertilizers and pesticides, will be discharged into the subsurface infiltration units with minimal pretreatment. Reports in the literature indicate a high failure rate for infiltration systems unless carefully protected from excess sediment loads that potentially clog the soil. . . . The qualitative impact of stormwater recharge and accumulative impact of sewage effluent and infiltrated stormwater on receiving wetlands has not been addressed . . . . We concur that the predicted nitrate-nitrogen concentration sewage effluent reaching the pond complies with drinking water standards of 10 mg/l. However, the impact of the effluent on the pond and its ecosystem has still not been addressed."

At the public hearing held on November 18, 2008, the plaintiff's representatives responded to MacBroom's concerns. Wayne Jacobsen, a professional engineer, expressed his disagreement with MacBroom "that the infiltration system has minimal pretreatment. We disagree with [him] that the chambers will be significantly impacted by sediment and [he is] wrong about the lack of details for the treatment." When Jacobsen then discussed certain aspects of the proposed system, commission member Frederick Schroeder stated: "Let me just ask you one thing. We've had an expert tell us that this is inadequate. You've just gone on and on about why you think it's adequate, but you know, we're faced with one expert versus another. Just listen to me, hear me out. Are you going to put this in detail, in writing? I mean this kind of oral presentation against, is not sufficient I don't think." When the plaintiff's attorney,

Neil Marcus, then opined that MacBroom's second letter did not acknowledge certain drawings submitted by the plaintiff a month earlier, Schroeder responded, "Or [MacBroom] may not think they're adequate." To that, Marcus replied, "[b]ut he has to tell us what's not adequate on it. He just says we haven't addressed them. That's what worries me."

On December 11, 2008, MacBroom sent the commission a letter regarding "additional correspondence" that he had reviewed, including certain documents furnished by the plaintiff and the tapes of the November 18, 2008 public hearing. MacBroom again articulated his opinion that the record before the commission was incomplete, stating in relevant part: "The following issues mentioned in my November 17 [2008] letter have not been resolved to my satisfaction . . . . The qualitative accumulative impact of stormwater recharge and impact of sewage effluent (other than pathogens) on the wetland have not been addressed or resolved. . . . In conclusion . . . the plans [submitted by the plaintiff] do not have a complete soil erosion and sediment control plan."

MacBroom expanded on that opinion in his testimony before the commission during the December 16, 2008 public hearing. He stated that the plaintiff's plan contained "very limited soil erosion control plans . . . . [T]he erosion control efforts to try to prevent no physical material, topsoil, sand, material from excavation, [and] material from future activities from getting into the wetlands and getting into the (inaudible) system and right now, at the downstream perimeter of the active construction zone, the plan only shows a single row of silt fence, which is a very minimal type of protection. It certainly, in my opinion, is not sufficient to avoid having some type of adverse impact on the wetlands due to sediment and erosion materials getting into the wetland, the pond and the rivering system. The [plaintiff's] position that [it has] indicated in previous correspondence was that more details would be provided at a later time if and after the project is approved at which time [it] would apply to the [department] for . . . a stormwater permit. From a conservation point of view, it takes it out of [the commission's] hand. It means that neither [the commission's consultants] nor the public nor the commission has a chance to review the full details of the erosion control plan. If something would postpone that to some later date, which is outside the purview of this public hearing and outside the purview of the commission, I strongly recommend that that material be part of the plan or that it is not sufficient and is not provided that the plan not be approved. My opinion is because of that (inaudible), the plans are incomplete and the impact of the project is indeterminate. So, there is a likelihood of having an adverse impact on the wetlands system which cannot be documented, cannot be measured, but that likelihood is

very strong."

MacBroom also opined that "the qualitative cumulative impact of stormwater recharge and the impact of sewage effluent which also discharges into the soil on the wetland has not been addressed or resolved other than pathogens which is the most obvious concern with virus or bacterial travel and [the plaintiff's expert] has addressed that in terms of pathogen travel times . . . . However, the impact though of modern chemicals that are used in discharge into sewage disposal systems . . . has not been addressed. We've suggested that several times now." In response to a question by Schroeder, MacBroom stated that the plaintiff's plan complied with the regulatory recommendations for dealing with pathogens. He continued: "The second part of [your] question dealt with the chemical additives, particularly household cleaners and solvents, petroleum products that they use and whether or not these will (inaudible) and that has not been addressed, and when you have a very porous (inaudible) soil as you have at this site, the coarse sand and gravel is actually good in terms of infiltration and capacity, but provides less filtration of those materials than would a fine (inaudible) soil." The plaintiff's attorney then asked MacBroom a series of questions, at one point inquiring, "so the only issues really are the stormwater issues that are still open?" MacBroom replied, "That and the cumulative impact of wastewater effluent and stormwater on the preceding water which is the wetland and the pond system downstream." The following colloquy then transpired:

"Marcus: Are you familiar with the information that [the plaintiff's expert] Russ Slayback presented to the commission the last couple of meetings?

"MacBroom: Yeah. That was very helpful to address the pathogen and (inaudible) and nitrogen (inaudible).

"Marcus: So, what in the state approved plans, state approved septic systems won't protect the wetlands? What are we worried about that we need to design for?

"MacBroom: "The state system for on-site sewage disposal systems really is protecting human health, not environmental health, so they talk about the impact on drinking water, the impact on pathogens and viruses. They do not talk about the impact of household cleaners and solvents and things like ammonia. They don't talk about things, other types of products that we know now go into septic systems. Things like medicine, and if you're aware of some communities in Connecticut that are having problems with medicine going through septic systems or sewage disposal systems so, from a wetlands point of view, our interest [is] a little bit different. We're not a health protection agency, we're a wetland protection organization.

"Marcus: So, what's the standard that we're designing for in Redding, because I mean every site in Redding.

You have wetlands all over the place. What's the standard that we need to design for?

"MacBroom: For most design standards that the commissions establish . . . are saying that the applicant is going to claim it has no impact on the wetland system, you should demonstrate it and that hasn't been done.

"Marcus: So . . . the way to do that [is to] actually put in a system and monitor it?

"MacBroom: You look at the concentration of various (inaudible) you may have within your waste stream. You look at what type of renovation you may have in the soil mantel. What type of renovation you may have in the septic system itself. What kind of dilution you have. It's the same type of process that [Slayback] went through with pathogens, but you do it for other chemicals."

In his public hearing testimony later that evening, Piotr Parasiewicz, an environmental engineer, echoed MacBroom's concern. He stated in relevant part that because the plaintiff is "proposing high density development that is not recommended by the state and specifically in the area close to water supply reservoirs . . . I would expect that a project like this would incorporate the latest stage of modeling and of science, the most precise models that will address all these questions. That will increase our certainty and evidence in fact . . . so as a very first thing that I would expect to happen in a project like this will be a solid groundwater model that will mathematically at least describe water to water flows in the projected areas. . . . What will happen to the temperature of this water? What will happen to the quality, the chemical quality of this water? I haven't seen any model like that in the [plaintiff's] plan. That's a major shortcoming. . . . I agree with . . . MacBroom that there is no convincing analysis that there will be no impact on the Saugatuck River."

At the January 6, 2009 public hearing on the plaintiff's application, the plaintiff's representatives attempted to address the various concerns raised by MacBroom and others. Jacobsen noted that MacBroom "did talk about some chemical additives like cleaners and solvents, etc. I think that the people that live at [the plaintiff's proposed housing community] are going to be under the same constraints as the people who live in the rest of Redding. What solvents can you use in your house, and what impact does your use of those solvents have on the watershed? That becomes a personal decision in each one of your households. There is no law governing what you can or can't use, and just because we have an affordable housing development . . . shouldn't change the treatment of the residents in that particular development. If the town, and I think I've heard [Marcus] propose that the town exercise more control over what people do in a general sense, we're doing what

everybody else is doing in those terms."

Slayback likewise testified that "MacBroom raised questions that [the plaintiff] did not address the combined effect of the septic systems and the stormwater infiltration system on the groundwater and on the wetlands that are downgradient from that. . . . Most organic contaminants that are from petroleum products or their ilk are attacked and remediated in the soil. It's called natural attenuation. The natural bacteria in the soil attack those contaminants. There are other contaminants that are very persistent in the subsurface and they're only subject to dilution. I've described to you in the past the nitrate dilution formula that applied to the design flow from the septic systems. That same dilution would apply to those contaminants. I've calculated that if you just took the infiltration occurring on the area that I used for the septic system dilution, 12 acres of the 14 plus acres of the site, that there would be an average of about 23,000 gallons a day of dilution for any contaminant that you were concerned about. When you look at the rest of the watershed of the site, which I didn't do for the septic systems, but you have that whole hillside that's owned by the Redding Land Trust and will never be developed, you end up with about 100,000 gallons a day. The soils there are not [as] pervious as the soils on the site because they are of a different geologic character, but there's a larger area of lower unit value of infiltration and that comes out to about a grand total of 100,000 gallons a day of dilution. . . .

"[MacBroom] referred to recent research by [the Environmental Protection Agency] and by other agencies as spoken to trace amounts [of] pharmaceuticals, cosmetic products, [and] other things that have shown up both in groundwater and in surface water from common household products. The products that any of us in our lives use on an everyday basis, and some of it ends up in our septic systems and whatever, including things like aspirin and Tylenol, that we excrete the part that our bodies don't absorb, and it becomes part of the waste stream. The research shows that these constituents are found at really trace levels at the parts per billion level, and I've just taken an example of a persistent chemical that is discharged to a septic system at 50 parts per billion, and if you just look at the dilution resulting from the entire flow of the septic system, that's reduced to about 12 parts per billion on the 12 acres of the site. That's the dilution I referred to previously as 23,000 gallons a day, and if you look at the overall watershed, including the Redding Land Trust property, it gets down to about 2 parts per billion. That's the best I can do in answering his question about how you deal with the combined effect of stormwater infiltration and the sewage infiltration on the groundwater and on the wetlands to the south. (Inaudible). I've only considered in that the infiltration and the groundwater flow. I have

not considered the further dilution of overlay and runoff which comes from the entire site."

During the public comment portion of the January 6, 2009 hearing, the commission heard from Christopher Kimball, a resident of Redding. A month earlier, Kimball had sent the commission a letter concerning the impact of chemicals on the wetlands and watercourses of Redding, stating in relevant part: "Biologic contaminants are not the only source of watershed degradation. Liquid and water soluble chemicals, such as detergents, can spoil watersheds. Septic system regulations and designs are intended primarily to prevent biological contamination. Their performance in reducing pollution from liquid and water soluble chemicals is questionable, particularly with the high permeability and short flight times at the [property]." Following Slayback's testimony, Kimball stated that "[i]t's nice to know that all organics or most of them or some of them decay in going through the underground water. I think it'd be nice to have an objective professional view as to exactly what the risks are of chemicals going through the underground water. . . . [Slayback] took as a number 50 parts per billion. . . . [T]he Sierra Club recommends 10 parts, less than 10 parts per billion for arsenic. . . . I'm not claiming that everyone is going to be dumping arsenic in or anything like that, but what I'm saying is it doesn't take much to get to the 50 parts per billion levels of pollutants. Of course everyone puts stuff in, so what you get is not part of a refinery where you have a very diluted 50 parts per billion coming out. You're getting a soup of all this stuff, but my point is, if you take .14 of a teaspoon . . . and dump it in the sink and flush it down and everyone flushes everything so that the whole septic system is running at full capacity, you then get 50 parts per billion. . . . [I]t's not hard to get levels of the order of 50 parts per billion by putting stuff in the septic system."

In his January 28, 2009 letter to the commission submitted following the close of the public hearing; see footnote 9 of this opinion; MacBroom summarized his review of the plaintiff's application and his "outstanding concerns." He stated in relevant part that "[o]n larger lots, the impact of chemicals is considered to be minor due to low concentrations. We do not know what the chemical impact of concentrating so many wastewater systems in a small area will be. On this proposed project, no definitive proof of its impact, or non-impact, has been provided."

During their deliberations, the commission members discussed the issue of chemical impact and the adequacy of the plaintiff's presentation with respect thereto. Chairman David R. Pattee stated that MacBroom had noted that the impact on the wetlands and watercourses was "unknown because he doesn't have any information about the chemical constituents and

the concentrations and things of that sort. Now, I know we did hear a little comment [at the January 6, 2009 hearing] about 50 parts per billion, but you know, we've heard that 50 parts per billion is like a teaspoon full. I don't know about anyone else, but when I put something down my sink, it's not usually a teaspoon." Commission member Victor DeMasi concurred with that assessment:

"DeMasi: You know [Pattee], I don't appreciate those comments [from the plaintiff's experts] simply because as an etymologist, okay, silkworm moths emit pheromones, and they have shown that one molecule of that pheromone is effective at like 10 to 15 miles, so this dilution factor is, we know from other areas of scientific investigation that we don't really know what dilution factors (inaudible).

"Pattee: Right, and we don't know what the daughter products of some of these compounds might be. I've worked in chemical factories where they've made all kinds of stuff, and while the parent product is toxic at level x, when that product breaks down into you know, 5 or 6 secondary type daughter products, those are much more lethal by a factor of 10 to 100.

"DeMasi: Look what chlorine does with ozone depletion. One chlorine atom can take out (inaudible) oxygen atoms or something.

"Pattee: So, I think [MacBroom's] statement about the chemical impact is certainly a reasonable one because we don't have any information for him to really study as the technical expert to help us understand that and his last statement says that this project is likely to have a significant adverse impact on the adjacent wetlands and river (inaudible) on various issues over the years. [MacBroom is] certainly a well recognized expert in the state.

"DeMasi: He's advocating skepticism, and [the plaintiff's] people are telling us firmly, and they have no real clue themselves."

The commission thereafter voted unanimously to deny the plaintiff's application, finding, inter alia, that it lacked adequate information to determine the impact of the proposed activities on the "western wetlands or the Saugatuck River." The aforementioned testimonial and documentary evidence substantiates that finding. In response to a query by the plaintiff's attorney during the December 16, 2008 public hearing, MacBroom advised the plaintiff to "demonstrate" that no adverse impact from chemicals would occur by employing the very same testing "process that [Slayback] went through with pathogens, but you do it for other chemicals." In his January 28, 2009 letter to the commission, MacBroom summarized his review of the plaintiff's application and opined that, with respect to "the chemical impact of concentrating so many wastewater systems in a small area" adjacent to the western wetlands

and the Saugatuck River, "no definitive proof of its impact, or non-impact, has been provided." The commission expressly credited that expert testimony, as was its exclusive prerogative.[13] See *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 540–41, 525 A.2d 940 (1987). There thus exists substantial evidence in the record before us that "the information that the plaintiff did produce was inadequate for the commission to determine whether there would be an adverse impact"; *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 293 Conn. 113; to the wetlands and the Saugatuck River.

In its memorandum of decision, the court's analysis of the incompleteness issue consisted of the following: "The commission now raises . . . issues of incompleteness which are inconsistent and contrary to the weight of the evidence. The record is replete with evidence and testimony as to the impact of the regulated activity upon the Saugatuck River. Indeed, the whole application and the entirety of the return of record concerns the impact on the Saugatuck River and the surrounding wetlands. To claim otherwise is disingenuous at best. The court also finds recurring reference both in testimony and evidence to pathogen renovation. Accordingly, the court finds [this reason for the commission's denial of the plaintiff's application] to be arbitrary and against the weight of the evidence." For two distinct reasons, we are troubled by that analysis.

First, it reflects a misunderstanding of the applicable legal standard.[14] In entertaining a challenge to a finding of an inland wetlands agency, the metric applied by a reviewing court is not whether "the weight of the evidence" supports the finding. As our Supreme Court repeatedly has explained, the substantial evidence test "is something less than the weight of the evidence" standard. (Internal quotation marks omitted.) *Rogers* v. *Board of Education*, supra, 252 Conn. 768; see also *Samperi* v. *Inland Wetlands Agency*, supra, 226 Conn. 588; *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 541. Under the substantial evidence standard, a "reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Internal quotation marks omitted.) *Tarullo* v. *Inland Wetlands & Watercourses Commission*, supra, 263 Conn. 584. Furthermore, the substantial evidence test "permits less judicial scrutiny" than the clearly erroneous standard of review. *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control*, supra, 247 Conn. 118; *Brunswick* v. *Statewide Grievance Committee*, supra, 103 Conn. App. 611. Accordingly, if the record contains any evidence tending to substantiate the commission's finding in a given instance, that determination must stand under

the substantial evidence test.

Second, the court's one paragraph analysis contains no mention of the chemical impact of the plaintiff's proposed regulated activities on the Saugatuck River and accompanying wetlands, despite the fact that it (1) was a significant concern articulated throughout the pendency of the plaintiff's application, (2) caused MacBroom to opine in his final letter to the commission that the plaintiff had failed to provide any "definitive proof of its impact, or non-impact," and (3) was discussed in detail during the commission's deliberations as a basis to deny the plaintiff's application. "[I]n an appeal from a decision of an inland wetlands commission, a [reviewing] court must search the record of the hearings before that commission to determine if there is an adequate basis for its decision. . . . Even if the agency's reasons for denying an application are merely speculative, the reviewing court must search the record for reasons to support the agency's decision . . . and, upon finding such, uphold that decision regardless of the language used by the agency in stating its reasons for the denial." (Citation omitted; internal quotation marks omitted.) *Manatuck Associates* v. *Conservation Commission*, 28 Conn. App. 780, 784, 614 A.2d 449 (1992). The record discloses evidence that the plaintiff failed to present information on the chemical impact of the proposed regulated activities sufficient for the commission to determine whether it would adversely impact the wetlands and Saugatuck River.

Under our decisional law and § 5.8 of the regulations, the commission is empowered to deny an application due to incompleteness. The commission exercised that authority in the present case. Because the commission's finding of incompleteness is supported by substantial evidence in the record, the court improperly sustained the plaintiff's appeal.

II

The commission also claims that the court improperly intimated that the commission lacked jurisdiction to regulate stormwater impacts on wetlands and watercourses due to a lack of regulations thereon. In its memorandum of decision, the court initially stated that it "is not persuaded by the plaintiff's argument that the commission was without jurisdiction to deny the application on the ground of pretreatment facilities for stormwater when it failed to adopt regulations specifically relating to stormwater." The court proceeded to review §§ 2.23 and 2.24 of the regulations, opining that they "are generally vague, contain no reference to stormwater, provide no guidelines for compliance and are akin to . . . an enabling clause." It further noted that § 2.26 of the regulations, which defines a significant impact activity, "is much more definitive . . . ." Most troubling to the commission, the court then stated that "while . . . Redding has promulgated regulations con-

ferring jurisdiction over stormwater et al., it has not established any standards specifically addressed to stormwater. Consequently, applicants must proceed in the dark or rely on other sources and experts to establish and meet requirements. However, given the court's ruling, the court need not address this issue."

The commission contends that the court rendered an improper advisory opinion in contravention of established precedent. By contrast, the plaintiff maintains that the foregoing statements constitute mere dicta, arguing that the court did not decide "any claim regarding the validity of the regulations, and certainly did not rule in favor of the [plaintiff] on this issue."

Although we agree that the court did not definitively decide the issue, it nevertheless remains that a question of "the subject matter jurisdiction of an administrative agency . . . can be raised at any time"; *Ross* v. *Planning & Zoning Commission*, 118 Conn. App. 55, 60, 982 A.2d 1084 (2009); and, once raised, that question must be resolved by a reviewing court. See *Wucik* v. *Planning & Zoning Commission*, 113 Conn. App. 502, 506–507, 967 A.2d 572 (2009), and cases cited therein. We therefore address the merits of the claim advanced by the plaintiff before the Superior Court and, at least partially, adopted by the court when it suggested that the commission lacked jurisdiction to regulate stormwater impacts on wetlands and watercourses due to the lack of "any standards specifically addressed to stormwater."

"Whether the [Superior Court] properly concluded that the commission had jurisdiction over the activities proposed by the plaintiff involves a legal question involving statutory interpretation, over which our review is plenary." *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, 266 Conn. 150, 158–59, 832 A.2d 1 (2003). The governing statutory scheme is contained in the act, § 22a-36 et seq. The purpose of the act "rests upon a specific legislative finding that [t]he inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed, and that [t]he preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state. . . . Accordingly, the broad legislative objectives underlying the [act] are in part to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution . . . [and by] protecting the state's potable fresh water supplies from the dangers of drought, overdraft, pollution, misuse and mismanagement by providing an orderly process to bal-

ance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology in order to forever guarantee to the people of the state, the safety of such natural resources for their benefit and enjoyment [and for the benefit and enjoyment] of generations yet unborn. . . . In order to accomplish these objectives, it is the public policy of the state to require municipal regulation of activities affecting the wetlands and watercourses within the territorial limits of the various municipalities or districts." (Citations omitted; internal quotation marks omitted.) *Red 11, LLC* v. *Conservation Commission*, 117 Conn. App. 630, 638–39, 980 A.2d 917, cert. denied, 294 Conn. 918, 984 A.2d 67 (2009).

In accordance with this policy and purpose, General Statutes § 22a-41 (a) sets forth specific criteria that must be considered by a wetlands commission in determining whether an application for a wetlands permit should be granted. Specifically, a commission is directed to consider: "(1) The environmental impact of the proposed regulated activity on wetlands or watercourses; (2) The applicant's purpose for, and any feasible and prudent alternatives to, the proposed regulated activity which alternatives would cause less or no environmental impact to wetlands or watercourses; (3) The relationship between the short-term and long-term impacts of the proposed regulated activity on wetlands or watercourses and the maintenance and enhancement of long-term productivity of such wetlands or watercourses; (4) Irreversible and irretrievable loss of wetland or watercourse resources which would be caused by the proposed regulated activity . . . and any mitigation measures which may be considered as a condition of issuing a permit for such activity including, but not limited to, measures to (A) prevent or minimize pollution or other environmental damage, [or] (B) maintain or enhance existing environmental quality . . . (5) The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened by the proposed regulated activity; and (6) *Impacts of the proposed regulated activity on wetlands or watercourses outside the area for which the activity is proposed and future activities associated with, or reasonably related to, the proposed regulated activity which are made inevitable by the proposed regulated activity and which may have an impact on wetlands or watercourses.*" (Emphasis added.) General Statutes § 22a-41 (a).

In *Prestige Builders, LLC* v. *Inland Wetlands Commission*, 79 Conn. App. 710, 831 A.2d 290 (2003), cert. denied, 269 Conn. 909, 852 A.2d 739, 740 (2004), this court addressed the issue of a commission's authority under the act to regulate activities in areas adjacent to wetlands or watercourses. We explained that "[t]he authority for a commission to regulate outside of [wetlands and watercourses] is governed by [General Stat-

utes] § 22a-42a (f) . . . ." Id., 718. Section 22a-42a (f) provides: "If a municipal inland wetlands agency regulates activities within areas around wetlands or watercourses, such regulation shall (1) be in accordance with the provisions of the inland wetlands regulations adopted by such agency related to application for, and approval of, activities to be conducted in wetlands or watercourses and (2) apply only to those activities which are likely to impact or affect wetlands or watercourses." The statute reflects "that one of [the act's] major considerations is the environmental impact of proposed activity on wetlands and water courses, which may, in some instances, come from outside the physical boundaries of a wetland or water course." (Internal quotation marks omitted.) *Prestige Builders, LLC* v. *Inland Wetlands Commission*, supra, 721. For that reason, "[o]ur courts consistently have recognized the authority of an inland wetlands commission to regulate activities in areas adjacent to wetlands and watercourses that would affect or impact such wetlands or watercourses." (Emphasis omitted.) Id., 720. The commission in the present case thus possessed the authority to regulate the plaintiff's proposed activities insofar as they impacted the Saugatuck River and adjacent wetlands.

At the same time, *Prestige Builders, LLC*, instructs that "a commission, under § 22a-42a (f), must first enact a formal regulation" before it can exercise its authority to regulate activities in such areas. Id., 720. Redding did precisely that in enacting the regulations. Section 1.4 of the Redding Inland Wetlands and Watercourses Regulations provides that the commission "shall enforce all provisions of the [act] and shall grant, grant with modifications, or deny licenses for all regulated activities affecting inland wetlands and watercourses in the Town of Redding pursuant to Sections 22a-36 to 22a-45, inclusive, of the Connecticut General Statutes." The regulations define "regulated activity" in relevant part as "[a]ny activity within the Town of Redding, the likely effect of which will have a significant impact on the existing condition of *any* of the wetlands or watercourses of the State." (Emphasis added.) Redding Inland Wetlands and Watercourses Regs. § 2.23 (e). The regulations likewise define "significant impact activity" in relevant part as "any activity, including, but not limited to . . . activities which may have a major effect or significant impact on the area for which an application has been filed *or on another part of an inland wetland or watercourse*." (Emphasis added.) Id., § 2.26. Furthermore, the regulations set forth "detailed parameters"; id., § 8.3; to guide the commission and place "the burden [on] the applicant to establish that the proposed regulated activities are consistent" therewith. Id., § 8.2. Pertinent to the present discussion is § 8.2 (f) of the regulations, which specifies the following: "Impacts of the proposed regulated activity on wetlands

or watercourses *outside the area for which the activity is proposed* and future activities associated with, or reasonably related to, the proposed regulated activity which are made inevitable by the proposed regulated activity and which may have an impact on wetlands or watercourses." (Emphasis added.) Id., § 8.2 (f). Those formal regulations authorized, and hence conveyed jurisdiction to, the commission to regulate the plaintiff's proposed activities insofar as they impacted the adjacent wetlands and river.

The plaintiff nevertheless argued in its brief to the Superior Court that the commission lacked jurisdiction because it "has not adopted any regulations concerning pretreatment facilities for stormwater." The plaintiff did not provide citation to a single Connecticut decision, and its argument consisted of abstract assertion, rather than application of controlling precedent. The sole authority referenced was a secondary source, which the plaintiff cited for the proposition that a commission "has no power to review regulated activities until it enacts regulations for that purpose in its regulations." See R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (3d Ed. 2007) § 11.4, p. 334. We believe that the plaintiff misunderstands the stated principle. Consistent with the teaching of *Prestige Builders, LLC*, a commission may not exercise authority over a particular activity unless and until it promulgates a regulation that encompasses the activity. See *Prestige Builders, LLC* v. *Inland Wetlands Commission*, supra, 79 Conn. App. 720. That general requirement is met in the present case by the enactment of the aforementioned provisions authorizing the commission to regulate activities affecting adjacent wetlands and watercourses. The regulations further provide, in relevant part, that "significant impact" activities subject to regulation by the commission include "(b) *Any* activity which substantially changes the natural channel or may inhibit the natural dynamics of a watercourse system . . . (c) *Any* activity which diminishes or has the potential to diminish the natural capacity of an inland wetland or watercourse to support desirable fisheries, wildlife, or other biological like; or to prevent flooding, to supply or store water, to protect the quality and quantity of groundwater contained in an aquifer, to perform the recharge process for aquifers, to assimilate waste, to facilitate drainage . . . (d) *Any* activity which causes or has the potential to cause substantial turbidity, siltation or sedimentation in a wetland or watercourse system . . . (e) *Any* activity which causes or has the potential to cause a substantial change in the flow of a natural watercourse or groundwater levels . . . (f) *Any* activity which causes or has the potential to cause contamination or pollution of a wetland or watercourse." (Emphasis added.) Redding Inland Wetlands and Watercourses Regs., § 2.26. The activities specified in those provisions plainly encompass the impact of

stormwater and its treatment, or lack thereof, on a wetland or watercourse.

Neither the plaintiff nor the Superior Court provided any authority, and we have not discovered any, indicating that a municipal inland wetlands agency, in promulgating such regulations, must provide specific "guidelines for compliance," as suggested in the court's memorandum of decision. Rather, our case law contains countless decisions in which the applicable standards are established through expert testimony before a commission. See, e.g., *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 293 Conn. 120; *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 80; *River Sound Development, LLC* v. *Inland Wetlands & Watercourses Commission*, 122 Conn. App. 644, 658–60, 2 A.3d 928 (2010).

Moreover, the commission, in its appellate brief, states that "the regulations are quite similar to the Inland Wetlands and Watercourses Model Municipal Regulations promulgated by the [department]. . . . These model regulations serve as the basis for the wetlands regulations in numerous Connecticut cities and towns. The model regulations, like the Redding regulations, do not contain the 'standards for the particular applications to specific categories of wetland jurisdiction' that the [Superior Court] sought. Instead, both the model regulations and the Redding regulations allow the question of whether a proposed activity will have a significant adverse environmental impact on wetlands or watercourse to be left to the expert testimony presented to the commission." We concur with that assessment. Certainly those model regulations are pertinent to any analysis regarding the adequacy of a municipality's regulations on a given matter.[15] The fact that the model regulations, like the Redding regulations, do not articulate detailed guidelines for compliance with respect to stormwater treatment further persuades us that the plaintiff's jurisdictional contention is without merit.

The regulations in the present case expressly authorize the commission to regulate the plaintiff's proposed activities insofar as they impacted the adjacent wetlands and Saugatuck River. The regulations also identify specific activities likely to have a significant impact thereon, which encompass the impact of stormwater treatment on a wetland or watercourse. We therefore reject the plaintiff's jurisdictional challenge to the commission's ability to regulate the proposed activities with respect to that impact.

## III

As a final matter, the commission argues that, after sustaining the plaintiff's appeal, the court improperly remanded the matter to it " 'for further consideration of any conditions that should be attached to the issu-

ance of the permit' to conduct the regulated activity." In light of our conclusion in part I B of this opinion that the court improperly sustained the plaintiff's appeal, we need not address the merits of that claim. We do note, however, that this court rejected a similar claim challenging the issuance of an identical remand order in *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, supra, 130 Conn. App. 89–90.

The judgment is reversed with respect to the commission's finding of incompleteness and the case is remanded to the Superior Court with direction to render judgment dismissing the plaintiff's appeal.

In this opinion the other judges concurred.

[1] The commission is the inland wetlands agency of the town of Redding. See Redding Inland Wetlands and Watercourses Regs. (Rev. 1999), § 1.4. Pursuant to General Statutes §§ 22a-36 to 22a-45, it is the entity charged with regulating the use of inland wetlands in that municipality.

[2] Also named as a plaintiff in this action is Reeda B. Harsche, the owner of the property in question. For purposes of clarity, we refer in this opinion to Three Levels Corporation as the plaintiff and Harsche by name.

[3] In hearing appeals from decisions of an inland wetlands agency or conservation commission, the Superior Court acts as an appellate body. See General Statutes § 22a-43.

[4] General Statutes § 22a-38 (15) defines wetlands in relevant part as: "[L]and, including submerged land . . . which consists of any of the soil types designated as poorly drained, very poorly drained, alluvial, and floodplain by the National Cooperative Soils Survey . . . ."

[5] General Statutes § 22a-38 (16) defines watercourses in relevant part as: "[R]ivers, streams, brooks, waterways, lakes, ponds, marshes, swamps, bogs and all other bodies of water, natural or artificial, vernal or intermittent, public or private, which are contained within, flow through or border upon this state or any portion thereof . . . ."

[6] Section 2.23 of the Redding Inland Wetlands and Watercourses Regulations (Rev. 1999) defines "regulated activity" in relevant part as "any operation within or use of a regulated area involving removal or deposition of material, or any obstruction, construction, alteration, contamination or pollution of such regulated area, which is likely to impact or affect wetlands or watercourses. . . ."

[7] At the public hearing on December 16, 2008, MacBroom introduced himself as a consulting engineer who had "been a consultant to the [commission] for about twenty years . . . . I'm a graduate of the University of Connecticut Bachelors and Master degree [programs] in engineering. I have thirty-six years of practice. I'm a registered professional engineer in about four or five states. I work all over the eastern part of the country. On a national level, I'm a member of the American Society of Civil Engineers Sedimentation Committee and a member of the American Rivers . . . Science and Technical Advisory Committee."

[8] In finding that the proposed activities were likely to have a significant adverse environmental impact, the commission stated in relevant part: "[T]he commission chooses to rely on the expert testimony and conclusions presented by Mr. MacBroom that the lack of adequate pretreatment facilities for stormwater prior to infiltration and ultimate discharge into the western wetlands and Saugatuck River is likely to have a significant adverse environmental impact thereon. . . . [T]he commission chooses to rely on the expert testimony and conclusions presented by Mr. MacBroom that the high rate of infiltration and groundwater migration present on the site, when combined with the amount of effluent produced by the community septic systems and the lack of adequate pretreatment facilities for stormwater prior to infiltration and ultimate discharge into the western wetlands and Saugatuck River, is likely to have a significant adverse environmental impact thereon."

[9] Although this letter was received after the close of the public hearing and approximately one month prior to the commission's deliberations on the matter, it remains that MacBroom served as a consultant to the commission in the proceeding before the commission. As explained in *Norooz* v. *Inland Wetlands Agency*, 26 Conn. App. 564, 569, 602 A.2d 613 (1992), "[o]ur law clearly prohibits the use of information by a municipal agency that has

been supplied to it *by a party* to a contested hearing on an ex parte basis." (Emphasis altered.) This court then discussed a number of cases from our Supreme Court that "have approved the consideration of information by a local administrative agency supplied to it by its own technical or professional experts outside the confines of the administrative hearing." Id., 570, citing *Holt-Lock, Inc.* v. *Zoning & Planning Commission*, 161 Conn. 182, 184–85, 286 A.2d 299 (1971); *McCrann* v. *Town Plan & Zoning Commission*, 161 Conn. 65, 77–78, 282 A.2d 900 (1971); *Kyser* v. *Zoning Board of Appeals*, 155 Conn. 236, 249–51, 230 A.2d 595 (1967); *Yurdin* v. *Town Plan & Zoning Commission*, 145 Conn. 416, 420–21, 143 A.2d 639, cert. denied, 358 U.S. 894, 79 S. Ct. 155, 3 L. Ed. 2d 121 (1958).

The court in *Norooz* proceeded to discuss the contours of the proper use of extrarecord analysis of evidence already in the record, focusing on "the nature and content of the extrarecord information relied on by an administrative agency . . . ." (Citation omitted.) Id., 573. It then concluded: "The proper inquiry for a reviewing court, when confronted with an administrative agency's reliance on nonrecord information provided by its technical or professional experts, is a determination of whether the challenged material includes or is based on any fact or evidence that was not previously presented at the public hearing in the matter." Id., 573–74. Finally, the court applied that inquiry to the facts at hand. First, it noted that "[n]either the trial court nor the plaintiffs have identified any fact or evidence relied on in those [communications] which was not already evidence of record in the administrative proceedings." Id., 574. Second, the court's review of the record of the administrative proceedings indicated that the communications by the agency's technical or professional experts outside the confines of the administrative hearing were "limited to a review of, a comment on and an opinion concerning evidence of record." Id. In addition, the court stressed that there was "no indication or suggestion . . . that facts not already of record in the lengthy administrative proceeding were considered by [the town engineers] in forming [their] conclusions and recommendations to the agency." Id. As a result, the court concluded that the agency properly relied on those ex parte communications. Id.

Consistent with that authority, the regulations in the present case provide in relevant part that the commission "is not precluded from consulting with its own experts after the close of the public hearing on information already in the record of the public hearing." Redding Inland Wetlands and Watercourses Regs. (Rev. 1999), § 8.5. Because there is no indication in the record before us that MacBroom's January 28, 2009 letter is anything other than a commentary on the evidence submitted during the public hearing—nor does the plaintiff so claim—the commission properly could rely on that letter in contemplating the merits of the plaintiff's application.

Furthermore, moments prior to the close of the public hearing, commission members inquired as to whether the plaintiff had furnished MacBroom with copies of the revised plan and other materials that it submitted to the commission earlier that day. The plaintiff's attorney replied that "[t]he stuff that's dated today has not been sent to [MacBroom]. We will do it though. We'll do it first thing in the morning." That testimony plainly contemplates MacBroom's review of those materials following the close of the public hearing.

[10] MacBroom testified during the public hearing that there would likely be "some type of adverse impact on the wetlands due to sediment and erosion materials getting into the wetland, the pond and the rivering system." Under *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Agency*, supra, 130 Conn. App. 78, such testimony does not constitute substantial evidence for a commission to find an actual adverse impact to wetlands or watercourses.

MacBroom further opined that in the "hypothetical" situation in which the underground infiltration system was not maintained, "then you would have [an] adverse impact on the wetland system both from excessive runoff and from the lack of removal of the impurities that tend to be taken out by the infiltration system." That opinion is deficient in two respects. First, it is no different than the testimony in *Estate of Casimir Machowski* that the detention basins at issue potentially could fail; *Estate of Casimir Machowski* v. *Inland Wetlands Commission*, supra, 137 Conn. App. 839–40; and, hence, amounts to mere conjecture. Second, MacBroom's hypothetical does not identify any specific harm to the wetlands or watercourses likely to result in the event that the infiltration system was not maintained.

[11] In its reply brief, the commission states: "An applicant for an inland wetlands permit has the burden of proving that it has met the statutory

prerequisites for a permit. . . . The applicant must further demonstrate to the local inland wetlands agency that its proposed development plan, insofar as it intrudes upon the wetlands, is the only alternative that is both feasible and prudent. . . . Here, the [Superior Court] failed to cite to even a single piece of evidence presented by [the plaintiff] to the commission that would have demonstrated that it had met the statutory prerequisites for a permit. As in [*Estate of Casimir*] *Machowski*, [the Superior Court] limited its memorandum of decision to a criticism of the expert testimony relied upon by the commission in reaching its decision. This is a shortcut which improperly shifts the burden on to the commission to demonstrate that a permit should not have issued, rather than place the burden on the applicant to demonstrate that it was entitled to a permit. An appropriate analysis would have required that [the plaintiff] demonstrate, by competent expert evidence, that (a) the proposed activities would not have a significant adverse environmental impact on the wetlands and watercourses and (b) if they did, that there were no feasible and prudent alternatives to the proposed activities which would have had less environmental impact." (Citations omitted.)

[12] Hereinafter, all references to the regulations in this opinion are to the 1999 revision of the regulations.

[13] "Local agencies are granted broad discretion because they are the closest to the circumstances and conditions which create the problem and shape the solution." (Internal quotation marks omitted.) *Ventres* v. *Inland Wetlands & Watercourses Commission*, supra, 25 Conn. App. 574.

[14] "Whether the substantial evidence test was applied properly by the trial court in its review of the [commission's] decision is a question of law over which our review is plenary." *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 70.

[15] The Inland Wetlands and Watercourses Model Municipal Regulations promulgated by the department are available at http://www.ct.gov/deep/lib/deep/water inland/wetlands/modelregsfinalof4thedition.pdf (last accessed January 29, 2014).

———————————————————